19-1715-cv
*New Hope Family Services, Inc. v. Poole*

# In the
# United States Court of Appeals
## for the Second Circuit

———

AUGUST TERM 2019

No. 19-1715-cv

NEW HOPE FAMILY SERVICES, INC.,
*Plaintiff-Appellant*,

v.

SHEILA J. POOLE, in her official capacity as Acting Commissioner for
the Office of Children and Family Services for the State of New York,
*Defendant-Appellee*.

———

On Appeal from the United States District Court
for the Northern District of New York

———

ARGUED: NOVEMBER 13, 2019
DECIDED: JULY 21, 2020

———

Before: CABRANES, RAGGI, *Circuit Judges*, KORMAN, *District Judge*.[*]

————————

Plaintiff, New Hope Family Services, Inc., is a voluntary, privately funded Christian ministry devoted to providing adoption services and authorized to do so in the State of New York for more than 50 years. New Hope professes that, consistent with its religious beliefs, it cannot recommend adoptions by unmarried or same-sex couples. It does not itself disapprove such couples; rather, it refers them to other adoption agencies. In 2018, the State's Office of Children and Family Services ("OCFS") informed New Hope that its policy respecting unmarried and same-sex couples violates the anti-discrimination mandate of N.Y. Comp. Codes R. & Regs. tit. 18, § 421.3(d). OCFS advised New Hope that it either had to change its policy or close its operation. Rather than do either, New Hope sued OCFS in the United States District Court for the Northern District of New York (D'Agostino, *J.*) for violations of its First and Fourteenth Amendment rights. It now appeals from a judgment dismissing its complaint for failure to state a claim and denying its motion for a preliminary injunction as moot. New Hope argues that the district court erred in concluding that it failed to state plausible claims for violations of its rights of Free Exercise of Religion and Free Speech and, therefore, in rejecting its preliminary injunction motion as moot.

———————————

[*] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

New Hope urges this court both to reinstate these claims and to grant it preliminary injunctive relief.

We agree that New Hope's Free Exercise and Free Speech claims should not have been dismissed at the pleadings stage and, therefore, that its preliminary injunction motion is not moot. We remand the case to the district court for further proceedings consistent with this opinion, including whether to grant New Hope a preliminary injunction preventing OCFS from mandating the closure of New Hope's adoption operation while the merits of this case are litigated. Pending the district court's ruling on that preliminary injunction motion, the narrow injunction granted by this court shall remain in effect.

REVERSED IN PART, VACATED IN PART, AND REMANDED.

---

ROGER G. BROOKS (Jeana J. Hallock, Alliance Defending Freedom, Scottsdale, Arizona, John J. Bursch, Alliance Defending Freedom, Washington, District of Columbia, Christopher P. Schandevel, Alliance Defending Freedom, Ashburn, Virginia, Robert E. Genant, Genant Law Office, Mexico, New York, *on the brief*), Alliance Defending Freedom, Scottsdale, Arizona, *for Plaintiff-Appellant*.

LAURA ETLINGER, Assistant Solicitor General (Barbara D. Underwood, Solicitor General,

3

Andrea Oser, Deputy Solicitor General, *on the brief*) *for* Letitia James, Attorney General of the State of New York, Albany, New York, *for Defendant-Appellee.*

Lori H. Windham, Nicholas R. Reaves, *for Amicus Curiae* The Becket Fund for Religious Liberty, Washington, District of Columbia.

Gregory Dolin, University of Baltimore School of Law, Baltimore, Maryland, *for Amici Curiae* The Jewish Coalition for Religious Liberty, Agudath Israel of America, The Rabbinical Alliance of America, and The Coalition for Jewish Values.

Geoffrey T. Blackwell, American Atheists, Inc., Washington, District of Columbia, Monica L. Miller, American Humanist Association, Washington, District of Columbia, Nicholas J. Little, Center for Inquiry, Washington, District of Columbia, Rebecca Markert, Freedom From Religion Foundation, Madison, Wisconsin, *for Amici Curiae* American Atheists, Inc., American Humanist Association, Center for Inquiry, and Freedom From Religion Foundation.

Cathren Cohen, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, Currey Cook, Karen L. Loewy, Lambda Legal Defense and Education

4

Fund, Inc., New York, New York, Richard B. Katskee, Kenneth D. Upton, Jr., Carmen N. Green, Patrick Grubel, Americans United for Separation of Church and State, Washington, District of Columbia, *for Amici Curiae* Civil Rights Organizations.

REENA RAGGI, *Circuit Judge*:

An important question of law animates this case: What is the proper relationship between the First Amendment—specifically, its guarantees of free exercise of religion and free speech—and laws protecting against various forms of discrimination? The question has arisen most recently when religious organizations, like Plaintiff here, seek some exemption from laws prohibiting discrimination on the basis of sexual orientation, arguing that such laws compel them to speak and behave contrary to the dictates of their consciences. The answer to this question—whether, in particular circumstances, anti-discrimination laws violate First Amendment rights—may profoundly affect our system of ordered liberty.[1]

---

[1] *See* Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 YALE L.J. 877, 880 (1963) (observing that "freedom of expression" is "an essential element in a good society" that cannot be regulated or restricted even to achieve "other or more inclusive ends—such as virtue, justice, equality . . . "; these must be pursued by "counter-expression and the regulation or control of conduct which is not expression").

But at this early stage in the case, we need not answer that ultimate question. Instead, we need decide only whether Plaintiff has stated a plausible claim for the violation of its First Amendment rights, affirming the district court if we conclude that Plaintiff has not stated a plausible claim, or reversing if we conclude that Plaintiff has.

Plaintiff, New Hope Family Services, Inc. ("New Hope"), is a voluntary, privately funded Christian ministry located in Syracuse, New York. Its avowed mission is to assist women with unplanned pregnancies and to provide temporary foster care and adoptive homes for children whose birth parents cannot care for them. In its more than 50 years of operation, New Hope has placed approximately 1,000 children with adoptive parents. There appears to be no question that each of these placements has been in the best interests of the adopted child. While New Hope operates under a certificate of incorporation authorizing it to provide adoption services in New York State, it has no contract with any government entity, and it does not receive any public funding.

At issue on this appeal is whether New Hope will be permitted to continue its adoption ministry in New York State. That comes into question because New Hope's ministry is informed by its religious belief in the biblical model of marriage as one man married for life to one woman. New Hope asserts that, consistent with this belief, it cannot recommend adoption by unmarried or same-sex couples because it does not think such placements are in the best interests of a child. Accordingly, it does not itself work with such couples but, rather, refers them to other adoption agencies. In 2018, officials of the

6

New York State Office of Children and Family Services ("OCFS") informed New Hope that such a policy violates a 2013 state regulation prohibiting discrimination against applicants for adoption services on the basis of "race, creed, color, national origin, age, sex, *sexual orientation*, gender identity or expression, *marital status*, religion, or disability . . . ."  N.Y. Comp. Codes R. & Regs. tit. 18 ("18 NYCRR"), § 421.3(d) (emphases added).  OCFS officials told New Hope that it either had to change its policy to conform to the regulation or close its adoption operation.

Unwilling to do either, New Hope initiated this action in the United States District Court for the Northern District of New York (Mae A. D'Agostino, *Judge*).  Pursuant to 42 U.S.C. § 1983, New Hope charged OCFS's Acting Commissioner Sheila J. Poole with violating its rights under the Constitution's Free Exercise of Religion, Free Speech, and Equal Protection Clauses, *see* U.S. CONST. amends. I, XIV, and requested declaratory and injunctive relief.[2] On cross-motions by New Hope for a preliminary injunction and by OCFS for dismissal, the district court granted dismissal pursuant to Fed. R. Civ. P. 12(b)(6), concluding that New Hope failed to plead any plausible constitutional claims.  Consequently, the court denied New Hope's preliminary injunction motion as moot.  *See New Hope Family Servs. Inc. v. Poole*, 387 F. Supp. 3d 194 (N.D.N.Y. 2019).  New Hope appeals from so much of the district court judgment, entered on May 16, 2019,

---

[2] Because Acting Commissioner Poole is sued only in her official capacity, in this opinion we refer to defendant as the State agency Poole heads, *i.e.*, "OCFS."

as dismissed its Free Exercise and Free Speech claims and rejected its preliminary injunction motion.

For the reasons stated in this opinion, we reverse the challenged dismissal judgment, vacate the denial of New Hope's motion for a preliminary injunction, and remand the case to the district court for further proceedings consistent with this opinion, including consideration of whether to grant a preliminary injunction.

## I. Background

In recounting the background to this case, we follow the standard applicable to the review of motions to dismiss, *i.e.*, we accept all factual allegations pleaded by New Hope in its complaint as true, and we draw all reasonable inferences in its favor. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010).

### A. New York Adoption Law

Private charities—many of them religiously affiliated—have long played an important role in caring for orphans and abandoned children in New York.[3] Adoption in New York, however, is now

---

[3] For example, in 1806, a group of New York City women—including Mrs. Alexander Hamilton—founded the Orphan Asylum Society, the city's first private charity devoted to caring for orphaned children who would otherwise have been consigned to public almshouses. *See* 1 CHILDREN AND YOUTH IN AMERICA: A DOCUMENTARY HISTORY 280 (Robert H. Bremner *et al.*, eds., 1970); Mary Kelley, Book Review, 90 J. OF AM. HIST. 1023, 1023 (2003) (reviewing ANNE M. BOYLAN, THE ORIGINS OF WOMEN'S ACTIVISM: NEW YORK AND BOSTON, 1797–1840 (2002)). In 1817, Catholic nuns affiliated with the Sisters of Charity began caring for New

"solely the creature of . . . statute," *Matter of Jacob*, 86 N.Y.2d 651, 657 (1995) (internal quotation marks omitted), and requires "a judicial proceeding" for a person (or couple) to "take[] another person into the relation of child and thereby acquire[] the rights and incur[] the responsibilities of parent in respect of such other person," N.Y. Dom. Rel. Law § 110.

Since first enacted in 1873, New York's adoption law has had as its primary purpose ensuring the "best interest[s]" of the child to be adopted. *Matter of Jacob*, 86 N.Y.2d at 658–59. But if that objective has remained constant, not so the factors informing it. Over a century and a half, New York's adoption law has been amended "innumerable times," such that its many requirements and prohibitions—both those established by statute and those

York City orphans at the St. Patrick's Asylum. *See* ROBERT ERNST, IMMIGRANT LIFE IN NEW YORK CITY, 1825–1863, 35 (1949). The Hebrew Orphan Asylum was established in Manhattan in 1822. *See* REPORT OF THE PRESIDENT, THE HEBREW BENEVOLENT AND ORPHAN ASYLUM SOCIETY OF THE CITY OF NEW YORK, PROCEEDINGS OF THE SEVENTY-FOURTH ANNUAL MEETING 15–16 (1897). The Catholic Orphan Society of Brooklyn was founded in 1826. *See* MARY J. OATES, THE CATHOLIC PHILANTHROPIC TRADITION IN AMERICA 6 (1995). New York's Episcopal Church created an Orphan Home and Asylum in New York City in 1851. *See* COMMITTEE ON THE HISTORY OF CHILD-SAVING WORK, NATIONAL CONFERENCE ON SOCIAL WELFARE, HISTORY OF CHILD-SAVING IN THE UNITED STATES 158 (1893). New York's two best known institutions devoted to caring for orphaned, abandoned, and otherwise needy children, the Children's Aid Society and the New York Foundling Hospital, were created, respectively, in 1853 by private philanthropists and in 1869 by the Sisters of Charity. *See* Joseph M. Hawes, *Creating New Families: The History of Adoption in the United States*, 32 REVIEWS IN AM. HIST. 90, 91 (2004) (book review); MARTIN GOTTLIEB, THE FOUNDLING 11–12 (2001).

propounded by regulation—have aptly been described as "a complex and not entirely reconcilable patchwork." *Id.* at 659. Nevertheless, because some understanding of that law is necessary to discuss New Hope's claims, we begin by discussing relevant statutory and regulatory provisions, starting with those pertaining to authorized adoption agencies.

### 1. Authorized Agencies

Adoption services in New York can only be provided by "authorized agencies," *i.e.*, entities incorporated or organized under New York law with corporate or legal authority "to care for, to place out or to board out children." N.Y. Soc. Serv. Law §§ 371(10)(a), 374(2).[4] More than 130 authorized agencies presently operate in New York. Fifty-eight such agencies are public, each operating as a unit of one of the State's social services districts. More than 70 authorized agencies are private, non-profit organizations that voluntarily provide adoption services. Some do so pursuant to contracts with local social services districts and with government funding; others, such as New Hope, operate independently.

The need for adoption services in New York, whether public or private, is undeniably great. In fiscal year 2017, more than 27,000

---

[4] Children are "placed out" for adoption; they are "boarded out" for foster care. *See* N.Y. Soc. Serv. Law § 371(12), (14).

10

children in the State were in foster care. Some 4,400 were awaiting adoption. Nevertheless, only 1,729 were actually adopted that year.

To facilitate adoptions, state law empowers authorized agencies to receive legal custody of children whose parents cannot care for them. *Id.* § 384; 18 NYCRR § 421.6. Authorized agencies can then board such children in foster homes or place them in prospective adoptive homes based on the agencies' assessment of the children's "best interests." Most relevant here, authorized agency approval, or consent, is required to finalize the adoption of any child placed by that agency. *See* N.Y. Dom. Rel. Law §§ 111(1)(f), 113(1).

A thicket of regulations applies to an authorized agency's placement of a child for adoption. These regulations detail numerous areas for agency consideration, but they comprise no mere quantitative checklist. Rather, most regulations, by their nature, entrust authorized agencies with considerable discretion in determining the best interests of a child. For example, agencies are instructed that in "[m]ak[ing] placement decisions," a consideration of the child's "best interests" shall "includ[e], but [is] not limited to" three factors. 18 NYCRR § 421.18(d). First is "the appropriateness of placement in terms of the age of the child and of the adoptive parent(s)." *Id.* § 421.18(d)(1). "Appropriateness" is hardly a matter of mathematical calculation; rather, it calls for the exercise of judgment. That same conclusion obtains for the second factor: "the physical and emotional needs of the child in relation to the characteristics, capacities, strengths and weaknesses of the adoptive parent(s)." *Id.* § 421.18(d)(2). Judgment is also called for by the third factor, which

requires placing sibling children together absent documented findings, made by the agency in consultation with identified professionals, that such placement would inure to the detriment of one or more of the children. *See id.* § 421.18(d)(3).

Judgment and discretion also necessarily inform the "adoption study process" that must precede any placement. *Id.* § 421.15. This is evident from the litany of topics that an authorized agency is expected to discuss in "explor[ing] each applicant's ability to be an adoptive parent." *Id.* § 421.15(d). Among these are the "characteristics and needs of children available for adoption"; principles of child development; the applicant's "reasons" for wishing to adopt; "understanding of the adoptive parent role"; "psychological readiness to assume responsibility for a child"; and "self-assessment" of "capacity to provide a child with a stable and meaningful relationship." *Id.* The agency is further expected to explore other household members' "attitudes . . . about adoption," and "the[ir] awareness of the impact that adoptive responsibilities have upon family life." *Id.* Again, none of these matters is quantifiable; rather, they call for qualitative assessments by authorized agencies.

Agency judgment will also have to inform the required assessment of a prospective adoptive parent's,

(1)   capacity to give and receive affection;
(2)   ability to provide for a child's physical and emotional needs;
(3)   ability to accept the intrinsic worth of a child, to respect and share his past, to understand the

12

meaning of separation he has experienced, and to have realistic expectations and goals;

    (4)    flexibility and ability to change;

    (5)    ability to cope with problems, stress and frustration;

    (6)    feelings about parenting an adopted child and the ability to make a commitment to a child placed in the home; and

    (7)    ability to use community resources to strengthen and enrich family functioning.

*Id.* § 421.16(a).

While this sampling of applicable regulations indicates a largely holistic approach to identifying the best interests of an adopted child, regulations single out certain factors that should not be considered or, at least, not be determinative. For example, a prospective adoptive parent cannot "be rejected on the basis of low income, or because of receipt of income maintenance payments." *Id.* § 421.16(j). Nor can rejection be based on marital status, subject to certain caveats. *Id.* § 421.16(d).[5] "Race, ethnic group, and religion" also cannot be a basis for rejection, *id.* § 421.16(i), though here too

---

[5] 18 NYCRR § 421.16(d) states with respect to "[m]arital status":

Agencies must not consider marital status in their acceptance or rejection of applicants. However, one married partner may not adopt without the other unless one partner is living separate and apart from his or her spouse pursuant to a legally recognizable separation agreement or decree of separation, or one partner has been or will be living separate and apart from his or her spouse for a period of three years or more prior to the commencement of the adoption proceeding.

13

other statutory and regulatory provisions appear to qualify the prohibition.[6]

At the same time, regulations instruct an agency to reject adoption applicants who fail to cooperate in the study process. *See id.* § 421.15(g)(1). Rejection is also warranted if the agency finds an applicant "physically" or "emotionally" "incapable of caring for an adopted child," *id.* § 421.15(g)(2)(i)–(ii), or if the agency concludes that "approval would not be in the best interests of children awaiting adoptions," *id.* § 421.15(g)(2)(iii)—both matters requiring an exercise of judgment. Rejection, however, triggers certain procedural safeguards, including the opportunity for a hearing before OCFS. *See id.* § 421.15(g)(3)–(8).

On the other hand, if, after completion of the required study, an authorized agency decides to approve adoption by a particular applicant or applicants—thereby concluding that adoption by that applicant or applicants is "in the best interests of children awaiting adoptions," *id.* § 421.15(g)(2)(iii)—the agency creates "a written

---

[6] *See* 18 NYCRR § 421.18(c) (requiring authorized agency to place child in adoptive home "as similar to and compatible with his or her religious background as possible with particular recognition that section 373(3) of the Social Services Law requires a court, when practicable, to give custody through adoption only to persons of the same religious faith as that of the child"); *id.* § 421.18(d)(2) (permitting authorized agency, when making placement decisions, to "consider the cultural, ethnic or racial background of the child and the capacity of the adoptive parent to meet the needs of the child with such a background as one of a number of factors used to determine best interests," but only where "[r]ace, color or national origin of the child or the adoptive parent . . . can be demonstrated to relate to the specific needs of an individual child").

summary of the study findings and activities, including significant characteristics of . . . family members, the family interaction, the family's relationship to other persons and the community, the family's child rearing practices and experiences, and any other material needed to describe the family for adoption purposes," and provides that summary "to workers in the agency . . . responsible for making placement decisions about children," *id.* § 421.15(e)(1). The agency works with the approved prospective parents to identify an adoptive child to be placed with them, "[m]ak[ing] placement decisions on the basis of the best interests of th[at] child." *Id.* § 421.18(d). The agency and prospective parents then submit to a court a verified petition for adoption and an adoptive placement agreement, *see* N.Y. Dom. Rel. Law § 112(2)–(3), (5), and the court decides whether to accept the agency's approval and to order adoption, *id.* §§ 113, 114. Generally, "no order of adoption shall be made until [the adoptive] child has resided with the adoptive parents for at least three months." *Id.* § 112(6).

New York law authorizes the Commissioner of OCFS to enforce laws and rules pertaining to adoption. *See* N.Y. Soc. Serv. Law § 34(3)(e).[7] By law, OCFS is authorized to visit, inspect, and supervise authorized adoption agencies. *See id.* § 371(10). Where OCFS determines that an agency has placed or boarded a child (1) "for

---

[7] It is undisputed on this appeal that this enforcement authority, originally conferred on the Commissioner of the New York State Department of Social Services, *see* N.Y. Soc. Serv. Law § 34(3)(e), now rests with OCFS, a branch of the New York State Department of Family Assistance, the successor agency to the Department of Social Services, *see* 1997 N.Y. Laws 2922.

purposes of gain," (2) "without due inquiry as to the character and reputation of the person with whom such child is placed," (3) "in such manner that such child is subjected to cruel or improper treatment or neglect or immoral surroundings," or (4) "in such manner that the religious faith of the child is not preserved and protected as provided [by law]," OCFS is specifically authorized, upon notice and an opportunity to be heard, to "issue an order prohibiting such an authorized agency . . . from thereafter placing out or boarding out any child." *Id.* § 385(1).

## 2. 18 NYCRR § 421.3(d)

We now turn to the regulation at issue in this case, 18 NYCRR § 421.3(d), beginning with some background to its pronouncement.

As the New York Court of Appeals has observed, the "pattern of amendments" to New York adoption law over the last 75 years "evidences a successive expansion of the categories of persons entitled to adopt." *Matter of Jacob*, 86 N.Y.2d at 660–61. Consistent with a general purpose to assure that "as many children as possible are adopted into suitable family situations," certain of these amendments reflect "fundamental changes that have taken place in the makeup of the family." *Id.* at 661 (internal quotation marks omitted).

As relevant here, until 2010, New York's Domestic Relations Law permitted only "[a]n adult unmarried person or an adult husband and his adult wife together" to adopt a child. N.Y. Dom. Rel. Law § 110 (2009). This law did not prohibit a homosexual person from

16

adopting as a single "adult unmarried person." *See Matter of Jacob*, 86 N.Y.2d at 662 (stating that "New York does not prohibit adoption by homosexuals," and observing that administrative regulation forbids denial of agency adoption on basis of homosexuality[8]). But it was understood not to permit an unmarried couple, whatever their sexual orientation, jointly to adopt a child.

That conclusion was eroded, however, by court rulings beginning with the 1995 decision in *Matter of Jacob*, 86 N.Y.2d 651. In that case, the New York Court of Appeals construed § 110's "adult unmarried person" phrase to allow the same-sex partner of a child's biological mother to adopt the child without the mother surrendering her rights, thereby effectively allowing a same-sex couple to become the child's parents. *See id.* at 660–62, 665–68. A decade later, the Fourth Department construed *Jacob*'s reasoning to compel the conclusion that an unmarried, same-sex couple—neither member of which was the child's biological parent—could jointly petition for adoption of a child rather than being required to file separately. *See In re Adoption of Carolyn B.*, 6 A.D.3d 67, 68–70, 774 N.Y.S.2d 227 (4th Dep't 2004).

---

[8] The referenced regulation stated that adoption "[a]pplicants shall not be rejected solely on the basis of homosexuality." 18 NYCRR § 421.16(h)(2) (2009). Rather, "[a] decision to accept or reject when homosexuality is at issue shall be made on the basis of individual factors as explored and found in the adoption study process as it relates to the best interests of adoptive children." *Id.* This regulation, promulgated in or about 1981, remained in effect until 2013, when it was supplanted by 18 NYCRR § 421.3(d), discussed *infra* at 19–21.

Mindful of these decisions, the New York State legislature, in 2010, amended § 110 to state that "[an] adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together may adopt another person." N.Y. Dom. Rel. Law § 110. In a signing statement accompanying his approval of the bill, then-Governor David Paterson observed that the amendment expanded qualified adoption applicants to include same-sex couples, "mak[ing] absolutely clear a principle that has already been established by the courts, and that ensures fairness and equal treatment to families that are ready, willing and able to provide a child with a loving home . . . includ[ing] same-sex couples, regardless of whether they are married." Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509 (internal citation omitted). At the same time, however, the Governor stated that "since the statute is permissive, it would allow for such adoptions without compelling any agency to alter its present policies." *Id.* In sum, he characterized amended § 110 as "a wise, just and compassionate measure that expands the rights of New Yorkers, without in any way treading on the views of any citizen or organization." *Id.*

The new law went into effect on September 17, 2010, and prompted OCFS to issue two "informational letters" to authorized agencies. The first letter, dated January 11, 2011, and entitled "Adoption by Two Unmarried Adult Intimate Partners," stated that amended § 110 "codifies . . . court decisions that authorize unmarried persons to adopt a child together," but "does not change or alter the standards currently in place for the approval of an individual as an

18

adoptive parent." OCFS Informational Ltr., 11-OCFS-INF-01. A copy of the Governor's quoted signing statement was attached to this letter.

The second letter, dated July 11, 2011, and entitled "Clarification of Adoption Study Criteria Related to Length of Marriage and Sexual Orientation," addressed the effect of amended § 110 on two existing OCFS regulations: 18 NYCRR § 421.16(e) (prohibiting rejection of applicants for adoption study on basis of "length of time they have been married, provided that time is at least one year") and 18 NYCRR § 421.16(h)(2) (prohibiting rejection of applicants "solely on the basis of homosexuality"). As to the first regulation, OCFS instructed authorized agencies that the amended statute no longer permitted rejecting an adoption applicant "solely on the basis that the length of marriage is less than one year." OCFS Informational Ltr., 11-OCFS-INF-05. As to the second regulation, OCFS stated that its purpose "is to prohibit discrimination based on sexual orientation in the adoption study assessment process," and that "OCFS cannot contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent." *Id.*

Two years later, in November 2013, OCFS replaced both regulations with the provision here at issue: 18 NYCRR § 421.3(d). *See*

35 N.Y. Reg. 3 (Nov. 6, 2013).[9]  It requires authorized adoption agencies,

> [to] prohibit discrimination and harassment against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability, and[] [to] take reasonable steps to prevent such discrimination or harassment by staff and volunteers, promptly investigate incidents of discrimination and harassment, and take reasonable and appropriate corrective or disciplinary action when such incidents occur.

18 NYCRR § 421.3(d).

In promulgating this provision, OCFS stated that the regulation would "promote fairness and equality in the child welfare adoption program by eliminating archaic regulatory language that implies the sexual orientation of gay, lesbian and bisexual prospective adoptive parents—but not of heterosexual prospective adoptive

---

[9] 18 NYCRR § 421 concerns "Standards of Practice for Adoption Services."  Section 421.3 lists "General Requirements."  At the time of the proposed amendment, the provision required adoption agencies (a) to have written policies and procedures; (b) to make provisions for those policies to be available and provide them to parents, adoptive applicants, and legal guardians; and (c) to maintain appropriate records.

parents—is relevant to evaluating their appropriateness as adoptive parents."  35 N.Y. Reg. 4 (Aug. 7, 2013) (proposed rulemaking).[10]

## B.　New Hope's Adoption Services

New Hope's Christian ministry was conceived by clergyman Clinton H. Tasker who, in 1958, sensed a "call of God" to care for women facing unplanned pregnancies and for their children.[11] Compl. ¶ 40.  Tasker's idea was realized in 1965, when Evangelical Family Service, Inc.—New Hope's predecessor agency—sought and obtained from New York's Board of Social Welfare a two-year certificate of incorporation authorizing it "to accept legal custody and guardianship of children; to provide protective service for children; to provide foster care service to child[ren] and unwed mother[s]; to place children for adoption; and [to] function in complete cooperation with all existing social welfare agencies."  J. App'x at 66; *see* N.Y. Soc.

---

[10] In opposing New Hope's motion for a preliminary injunction in this litigation, OCFS assigned three other purposes to 18 NYCRR § 421.3(d): (1) it helps "provide a broad and diverse pool of adoptive parents" and "maximizes the number of prospective adoptive parents who may be assessed"; (2) it "seeks to prevent the trauma and social harm caused by discrimination against [LGBTQ] people" and "provides support and affirmation to LGBTQ youth awaiting an adoptive placement"; and (3) it reinforces "the State['s] . . . strong interest in preventing discrimination in the provision of government services."  J. App'x at 168–69 (McCarthy Decl.).

[11] New Hope traces the long tradition of Christian adoption ministries to the following biblical passage: "Religion that God our Father accepts as pure and faultless is this:  to look after orphans and widows in their distress."  James 1:27 (quoted in Compl. ¶ 35).

Serv. Law § 371(10)(a). Two years later, in 1967, New York made the certificate "perpetual." J. App'x at 73–76.[12] Thus, when in a 2008 letter, OCFS—as successor to the Board of Social Welfare—traced New Hope's authorization history, it confirmed that New Hope's "authority to place children for adoption and to perform other adoption services, including home studies . . . in New York is perpetual." *Id.* at 79.

New Hope maintains that its "Christian faith and religious beliefs motivate and permeate its mission and all of its activities." Compl. ¶ 52. In defending dismissal, OCFS does not contend otherwise, nor does it challenge the sincerity of New Hope's religious beliefs.

Consistent with its religious identity, New Hope requires all board members, staff, and volunteers to "be in agreement with and sign New Hope's statement of faith, . . . be in agreement with and supportive of [its] religious mission, and . . . conduct themselves consistent with Christian faith and belief." *Id.* ¶ 53. Moreover, "to scrupulously ensure its autonomy to operate in accordance with its religious beliefs, New Hope accepts no government funding." *Id.* ¶ 51.

---

[12] *See* N.Y. Bus. Corp. Law § 202(a)(1) ("Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power in furtherance of its purposes . . . [t]o have perpetual duration.").

New Hope asserts that its religious beliefs prompt it to conduct its adoption ministry in such a way as to convey a "system of values about life, marriage, family and sexuality to both birthparents and adoptive parents." *Id.* ¶ 270. Thus, when prospective parents attend an initial orientation session, "New Hope . . . open[s] the meeting with prayer, . . . provid[es] information about the organization's history and religious mission," and uses "scripture passages" to explain that "children are to be valued as gifts from God." *Id.* ¶ 105.

New Hope also uses prayer and religious literature in conducting the second, "home study," step of the adoption process. *See id.* ¶¶ 109, 111–112. During this study, a New Hope caseworker "explore[s] the prospective adoptive parents' experience with children, family support, parenting philosophy, ability to parent a child of a different race or culture, faith and religious practice, and family dynamics, including interviews of any children in the home." *Id.* ¶ 114.

At the third step of the process, a New Hope caseworker explores in still more detail the prospective parents' "strengths and weaknesses," their "family dynamics, thoughts on discipline and affection, work responsibilities, marital stability . . . , mental-health history, financial stability, and parenting philosophy." *Id.* ¶ 117. Married couples are interviewed together and separately to determine the "intimacy and strength of the marriage" in order to ensure that their home "will be a safe, stable environment for the [adopted] child." *Id.* ¶¶ 116, 118, 120.

Following this session, the caseworker and New Hope's Executive Director together review the entire case file to decide whether to approve or disapprove applicants as prospective adoptive parents based on "the best interest of any child who may be placed in the home." *Id.* ¶ 121.

Approved adoptive parents then participate in the fourth step of the process where, among other things, New Hope instructs them as to how to prepare their "profiles." New Hope shows approximately five such profiles to a birthmother for her to "select the adoptive family with whom she feels comfortable entrusting her child." *Id.* ¶¶ 66, 97, 125. New Hope states that "[a]ll" birthmothers with whom it has worked "have been able to find a family with whom they were comfortable placing their child for adoption from the profiles" thus provided. *Id.* ¶ 99.

At the fourth step, New Hope also asks approved adoptive parents whether they are willing to participate in "open adoptions," *i.e.*, adoptions where birth parents maintain some contact with the adopted child pursuant to a "Contact Agreement" facilitated by New Hope until the child turns 18. Because almost all New Hope's adoptions are "open," its involvement in adoptions thus continues well after a court finalizes transfer of a child's custody. *Id.* ¶¶ 78–81.

Finalization does not occur, however, until after a child spends no fewer than three months, and sometimes as much as a year, living with approved adoptive parents under New Hope's supervision. During this period, New Hope maintains legal custody of the child

24

and conducts regular visits to ensure that the child is being well cared for and to assess the degree of attachment developing between the adoptive parents and the child.  *See id.* ¶¶ 133–138.

New Hope's "field reports" about the placement, together with its home study report, are then finalized and notarized and become its "official recommendation of the adoptive family for the adoption of the specific child."  *Id.* ¶¶ 139–141.

### C.    New Hope's Religious Beliefs and 18 NYCRR § 421.3(d)

The particular religious belief subscribed to by New Hope and relevant to this appeal is that "[t]he biblical model for the family as set out in the Bible—one man married to one woman for life for their mutual benefit and the benefit of their children—is the ideal and healthiest family structure for mankind and specifically for the upbringing of children."  *Id.* ¶ 56.  Because of this belief, New Hope asserts that it "will not recommend or place children with unmarried couples or same-sex couples as adoptive parents."  *Id.* ¶ 153.  It does not believe that such a placement is in a child's best interests.

New Hope maintains that its religious views about marriage do not otherwise limit its ministry.  In providing pregnancy counseling, New Hope routinely works with unmarried women and does so without regard to their sexual orientation.  But, as to adoption, New Hope's religious views about marriage are formalized in a "Special Circumstances" policy, which states,

> If the person inquiring to adopt is single . . . [t]he Executive Director [of New Hope] will talk with them to discern if they are truly single or if they are living together without the benefit of marriage. . . . [B]ecause New Hope is a Christian Ministry it will not place children with those who are living together without the benefit of marriage.
>
> If the person inquiring to adopt is in a marriage with a same sex partner . . . [t]he Executive Director will . . . explain that because New Hope is a Christian Ministry, we do not place children with same sex couples[].

*Id.* ¶ 154.[13]

Nevertheless, mindful that its religious beliefs are not universal, New Hope does not itself "reject" unmarried or same-sex couples as adoptive parents. *See supra* at 14 (discussing rejection of adoption applicants). Rather, it effectively recuses itself from considering their adoption applications, referring them at the outset to "the appropriate county social services office or another [authorized adoption services] provider." *Id.* ¶ 156. New Hope asserts on information and belief that "no same-sex couple or unmarried couple who has inquired with New Hope about adoption has ever complained to OCFS about how New Hope handled their inquiry." *Id.* Nor is there anything in the present record indicating

---

[13] While it appears that New Hope's religious view of marriage has remained constant throughout its history, it is not clear from the record exactly when this policy was committed to writing.

that New Hope's policy has prevented any same-sex or unmarried couple wishing to adopt from doing so.

OCFS appears not to have questioned New Hope's practice respecting unmarried and same-sex couples until 2018 when, pursuant to what OCFS characterized as a "new policy" implemented that year, it conducted a "comprehensive on-site review[] of each private provider's procedures." *Id.* ¶ 182.[14] In advance of a September 6, 2018 site review of New Hope, OCFS Permanency Specialist Suzanne Colligan requested, and New Hope's then-Acting Executive Director Judith Geyer provided, a copy of New Hope's policies and procedures manual, which included the above-quoted Special Circumstances policy.

Approximately one month after the site visit, on October 1, 2018, Colligan sent Geyer a review letter issued by OCFS's Regional Director for Child Welfare and Community Services. That letter commends New Hope for "a number of strengths" in providing adoption services, specifically, (1) "the strong emphasis [placed] on assisting the birth parents in making an informed decision for their newborn," (2) "providing them time to make the [adoption] decision," and—perhaps most notably for purposes of this appeal—(3) "a supportive and detailed adoptive family selection process." *Id.,* Exh. 6. It identifies only three areas for follow-up: (1) "[i]mmediate implementation" of OCFS's "Foster/Adoptive Home Certification

---

[14] The record does not indicate the impetus for this new policy or detail how it departs from previous practice.

Approval Process," (2) better procurement of health information pertaining to adoptive families, the adoptee, or birth parent; and (3) New Hope's role and limitations regarding the exchange of information pertinent to surrender of custody. *Id.* The review letter makes no mention of New Hope's Special Circumstances policy or of 18 NYCRR § 421.3(d).

A week later, however, in an October 9, 2018 telephone call to Geyer, Colligan stated that she had read New Hope's manual, and that its Special Circumstances policy violated § 421.3(d). Colligan presented New Hope with two options: comply with the regulation by agreeing to place children with unmarried and same-sex couples, or "choos[e] to close." *Id.* ¶¶ 188–190. Geyer responded that New Hope was unwilling to violate its religious beliefs by placing children with unmarried or same-sex couples, and that it would "never choose to close." *Id.* ¶¶ 191, 193. Rather, OCFS would be "forcing" New Hope to close in violation of its religious freedom. *Id.* ¶ 193. Colligan told Geyer that "[s]ome Christian ministries have decided to compromise and stay open." *Id.* ¶ 192 (brackets in original).[15]

---

[15] As evidence that OCFS forced religious adoption agencies that did not compromise their beliefs to close, New Hope points to the 2018 disappearance of a number of religious authorized adoption agencies from OCFS's website. *See* Compl. ¶ 202. It also observes that in a *Buffalo News* report about Catholic Charities Buffalo ending its 95-year history of adoption and foster care services, an OCFS spokeswoman is quoted as saying, "[d]iscrimination of any kind is illegal and in this case OCFS will vigorously enforce the laws designed to protect the rights of children and same sex couples. In New York State, we welcome all families who are ready to provide loving and nurturing homes to foster or adoptive children.

28

On October 11, 2018, Colligan advised Geyer that New Hope would be receiving a letter requesting a formal written response to the choices it had been given. The referenced letter from Laura Velez, Deputy Commissioner of Child Welfare and Community Services, states that New Hope's "policy pertaining to not placing 'children with those who are living together without the benefit of marriage' or 'same sex couples' violates Title 18 NYCRR § 421.3, and is discriminatory and impermissible." *Id.*, Exh. 7. The letter requests that "within 15 days of receipt of this letter," New Hope state in writing whether it will or will not "revise the policy so as to comply with the above-cited regulation" and, thus, "continue the existing adoption program." *Id.* It advises that should New Hope "fail to bring the policy into compliance with the regulation, OCFS will be unable to approve continuation of [New Hope's] current adoption program and [New Hope] will be required to submit a close-out plan for the adoption program." *Id.*

D.    **Procedural History**

Rather than accept either of OCFS's options, New Hope commenced this action on December 6, 2018. On December 12, 2018, it moved preliminarily to enjoin OCFS from forcing the closure of New Hope's adoption services. OCFS opposed the motion, and on

---

There is no place for providers that choose not to follow the law." *Id.* ¶ 204 (quoting Stephen T. Watson & Harold McNeil, *Catholic Charities Ending Foster, Adoption Programs Over Same-Sex Marriage Rule*, BUFFALO NEWS, August 23, 2018).

January 14, 2019, moved to dismiss New Hope's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Following oral argument, the district court granted OCFS's motion to dismiss and denied New Hope's motion for a preliminary injunction as moot. *See New Hope Family Servs., Inc. v. Poole*, 387 F. Supp. 3d 194. The district court ruled that New Hope failed to state a plausible Free Exercise claim because 18 NYCRR § 421.3(d) is "[o]n its face . . . generally applicable and . . . neutral," and no evidence indicated that the regulation "was drafted or enacted with the object to infringe upon or restrict practices because of their religious motivation." *Id.* at 213–14 (internal quotation marks omitted). The district court ruled that New Hope failed to state a plausible Free Speech claim because § 421.3(d) "simply do[es] not compel speech," or only compels "government[] speech." *Id.* at 217. Insofar as New Hope also cast its Free Speech claim as one of "expressive association," the district court ruled that § 421.3(d) caused only "slight impairment to New Hope's expressive activity," which, in any event, was outweighed by "the state's compelling interest in prohibiting the discrimination at issue." *Id.* at 219–20.[16]

---

[16] In granting dismissal, the district court observed that "OCFS does not contend that New Hope is not acting in the best interests of the children" it places for adoption, *New Hope Family Servs. v. Poole*, 387 F. Supp. 3d at 224, and expressed regret that the parties had not themselves been able to reach some accommodation:

Until recent events, the parties have had a fruitful relationship; a relationship that has benefitted New York's children in immeasurable ways. For this reason, the Court would prefer that the parties seek out

New Hope timely filed this appeal, moving for a preliminary injunction that would allow it, pending a final ruling by this court, to continue servicing pending adoptions subject to New Hope's agreement not to accept any new adoption applications. This court granted such an injunction on November 4, 2019. On June 18, 2020, New Hope moved for this court to expand its injunction pending appeal to allow New Hope to accept new adoption applications.

## II. Discussion

### A. Motion To Dismiss

#### 1. Standard of Review

We review *de novo* the dismissal of a complaint for failure to state a claim. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d at 110. In doing so, we "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted); *accord DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d at 111 ("When there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief." (emphasis in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009))).

---

some compromise to their current dispute without further judicial intervention . . . to avoid what may appear . . . to be harsh legal results.

*Id.* at 225 (internal quotation marks omitted).

## 2.    Free Exercise Claim

New Hope argues that the district court erred in concluding that it failed to plead a plausible Free Exercise claim against OCFS. Specifically, New Hope challenges the district court's determination that OCFS was simply enforcing a neutral and generally applicable anti-discrimination regulation when it insisted that New Hope either agree to approve unmarried and same-sex applicants for adoption or close its adoption service. For reasons explained herein, we conclude that the dismissal of New Hope's Free Exercise claim was premature. The pleadings allege that OCFS's actions preclude New Hope from pursuing its adoption ministry consistent with its religious beliefs. Even if such intrusion on the exercise of religion would not violate the First Amendment if compelled by a valid and neutral law (or regulation) of general application, the pleadings here, when viewed in the light most favorable to New Hope, do not permit a court to conclude, as a matter of law, that OCFS's actions in promulgating and enforcing the regulation at issue were neutral and not informed by hostility toward certain religious beliefs.

### a.    Applicable Legal Principles

To explain that conclusion, we start with the First Amendment, which famously states that "Congress shall make no law respecting an establishment of religion, or preventing the free exercise thereof . . . ." U.S. CONST. amend. I. The Fourteenth Amendment extends the protections of these Establishment and Free Exercise Clauses against

state and local governments. *See* U.S. CONST. amend. XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

As the Supreme Court reiterated only last term, "[t]he Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously," not a society devoid of religious beliefs and symbols. *American Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2074 (2019); *see also County of Allegheny v. ACLU*, 492 U.S. 573, 623 (1989) (O'Connor, J., concurring in part and concurring in the judgment) (observing that First Amendment does not require courts to "sweep away all government recognition and acknowledgment of the role of religion"). The Free Exercise Clause, in particular, guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]," even doctrines out of favor with a majority of fellow citizens. *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990). Thus, it has long been the rule—as famously pronounced by Justice Jackson—that no government "official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *accord Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). Rather, "[t]he Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop v.*

*Colo. Civil Rights Comm'n*, 138 S. Ct. at 1731 (internal quotation marks omitted).

These principles are particularly relevant to beliefs about family and marriage, where society's views have sometimes proved more fluid than religion's. As pertinent here, the Supreme Court recently traced how society's view of same-sex marriage has evolved over the last forty years, such that what was once prosecuted as a criminal offense is now recognized as a fundamental right. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2596–605 (2015). Nevertheless, some religions maintain that same-sex marriage is morally wrong, just as some religions view unmarried co-habitation, remarriage after divorce, or conception without marriage as morally wrong notwithstanding society's general acceptance of such conduct. The Supreme Court has declined to fault such religious views about marriage, observing that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here." *Id.* at 2602. Indeed, the Court has suggested that differing secular and religious views in this area should be allowed to coexist. This is evident from the fact that, at the same time that the Court ruled that the Constitution does not permit government to prohibit same-sex marriage, it "emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Id.* at 2607. Indeed, such advocacy is constitutionally protected:

> The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Id.* The Court reiterated the point the next year: "[R]eligious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression." *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1727; *cf. Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1753–54 (2020) (construing Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), to prohibit discrimination on the basis of sexual orientation, but recognizing fear that compliance "may require some employers to violate their religious convictions" and expressing "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution").

But if some accommodation on this matter is the Court's expectation, delineating constitutional boundaries is challenging. As the Chief Justice observed in *Obergefell*, anticipating the very case now before us, "[h]ard questions arise when people of faith exercise religion in ways that may be seen to conflict with the new right to same-sex marriage—when, for example, . . . a religious adoption agency declines to place children with same-sex married couples." *Obergefell v. Hodges*, 135 S. Ct. at 2525–26 (Roberts, C.J., joined by Scalia and Thomas, JJ., dissenting).

In confronting those hard questions here, we are mindful that the Supreme Court has recognized that the exercise of religion can involve not only belief and expression, but also "physical acts," such as "assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Employment Div. v. Smith*, 494 U.S. at 877. The Free Exercise Clause does not permit government to "ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.*, at least not without showing that the ban "is justified by a compelling interest and is narrowly tailored to advance that interest," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi v. Hialeah*"), 508 U.S. 520, 533 (1993). But the law has permitted government to avoid showing a compelling interest and narrow tailoring if the challenged ban on a religious practice is required by a valid and neutral law of general applicability. *Employment Div. v. Smith*, 494 U.S. at 879 (stating that Free Exercise Clause does "not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)" (internal quotation marks omitted)).

Almost from its pronouncement, *Smith*'s construction of the Free Exercise Clause has prompted criticism. *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1420 & n.43 (1990); *see also Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (Alito, J., joined by

Thomas, Gorsuch, and Kavanaugh, JJ., concurring in denial of *certiorari*) (observing that case did not ask Court to revisit *Employment Division v. Smith*, which "drastically cut back on the protection provided by the Free Exercise Clause"). The Supreme Court has recently agreed to revisit its decision in *Smith*, with argument expected some time next term. *See Fulton v. City of Philadelphia*, 140 S. Ct. 1104 (Feb. 24, 2020) (mem.). We need not delay deciding this case, however, to see if *Fulton* yields a more protective Free Exercise standard than *Smith* because we conclude that New Hope's Free Exercise claim should not have been dismissed even under the *Smith* standard as presently applied. A court construing the pleadings in the light most favorable to New Hope could not conclude as a matter of law that OCFS was simply applying a valid neutral law of general application when it instructed New Hope either to agree to approve unmarried and same-sex couples as adoptive parents or to close its 50-year adoption ministry.

The Supreme Court has instructed that a law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." *Lukumi v. Hialeah*, 508 U.S. at 533. To determine the object of a law, a court "begin[s] with its text, for the minimum requirement of neutrality is that a law not discriminate on its face" against religion. *Id.* Like the district court, we conclude that the regulation here at issue, 18 NYCRR § 421.3(d), does not on its face discriminate against religion because its prohibitions apply equally to all adoption services, both secular and religious.

But facial neutrality is only the first, and by no means the determinative, step in a Free Exercise inquiry. *See Lukumi v. Hialeah*, 508 U.S. at 534. Mindful that government hostility to religion can be "masked, as well as overt," a court must proceed to a second step of inquiry to identify even those "subtle departures from neutrality," or "covert suppression of particular religious beliefs" that will be not be tolerated unless supported by a compelling interest and narrow tailoring. *Id.* at 534, 546 (internal quotation marks omitted); *accord Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1731. At this second step, a court must "survey meticulously" the totality of the evidence, "both direct and circumstantial." It must consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi v. Hialeah*, 508 U.S. at 534, 540 (internal quotation marks omitted); *accord Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1731. It must also carefully consider "the effect of a law in its real operation," which "is strong evidence of its object." *Lukumi v. Hialeah*, 508 U.S. at 535.

Applying those principles here, we conclude that the pleadings give rise to a sufficient "suspicion" of religious animosity to warrant "pause" for discovery before dismissing New Hope's claim as implausible. *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1731.

### b. The District Court's Cited Authorities Do Not Support Dismissal

New Hope maintains that the following pleadings indicate that 18 NYCRR § 421.3(d), as promulgated and enforced, is not neutral and generally applicable.

(1) Amended Dom. Rel. Law § 110—the law OCFS contends 18 NYCRR § 421.3(d) "is consistent with" and "implements," Appellee Br. at 6–7—is permissive, not mandatory. Moreover, New York's then-Governor, in signing the law, specifically stated that it "allow[s] for . . . adoptions [by unmarried and same-sex couples] without compelling any agency to alter its present policies." Compl. ¶ 7.

(2) Initially, OCFS took the position that amended § 110 "does not change or alter the standards currently in place for the approval of an individual as an adoptive parent." *Id.* ¶ 162.

(3) OCFS then shifted its position. Despite the Governor's statement that the amended statute did not require agencies to "alter [their] present policies," OCFS asserted that it "cannot contemplate any case where the issue of sexual orientation would be a legitimate basis, whether in whole or in part, to deny the application of a person to be an adoptive parent." *Id.* ¶ 164.

(4) During the rulemaking process preceding promulgation of 18 NYCRR § 421.3(d), OCFS stated that the regulation was needed to "eliminate *archaic* regulatory language, which

39

implies that the sexual orientation of gay, lesbian and bisexual prospective parents . . . is relevant to evaluating their appropriateness as adoptive parents." *Id.* ¶ 166 (emphasis in original).

(5) When New Hope told OCFS that its comply-or-close order violated New Hope's freedom of religion, OCFS told the agency that "some Christian ministries have decided to compromise and stay open." *Id.* ¶ 192 (brackets removed).

(6) Since § 421.3(d) took effect, "several voluntary faith-based authorized [adoption] agencies that were listed on OCFS'[s] website in January of 2018" and that "share similar beliefs" to New Hope's "have been removed by OCFS from that posted list." These include "several Catholic providers, a Jewish provider, an LDS provider, and a Muslim provider." *Id.* ¶¶ 202–203.

(7) In a 2018 news report about the closure of a Christian adoption ministry operating for 95 years in Buffalo, New York, an OCFS spokeswoman is quoted stating that "[d]iscrimination of any kind is illegal . . . . There is no place for providers that choose not to follow the law." *Id.* ¶ 204.

(8) The State's statutory and regulatory scheme governing adoption "provides exemptions for secular, nonreligious purposes" and "allow[s] adoption providers to consider protected characteristics when making placements," while

imposing an "absolute bar" against consideration of sexual orientation. *Id.* ¶¶ 248–250.

In concluding that these allegations were insufficient to state a plausible Free Exercise claim, the district court observed that the allegations did not indicate "[the] type of hostility or bias demonstrated in *Masterpiece Cakeshop* or *Lukumi.*" *New Hope Family Servs., Inc. v. Poole*, 387 F. Supp. 3d at 214. Instead, the district court thought that New Hope's pleadings "more closely align with *Fulton* [*v. City of Philadelphia*, 922 F.3d 140 (3d Cir. 2019), *cert. granted*, 140 S. Ct. 1104, *see supra* at 37], where the Third Circuit found that the plaintiff was unlikely to succeed on its claim because the record demonstrated that the defendant respected the plaintiff's sincerely held beliefs while enforcing the anti-discrimination provision at issue." *Id.*

We cannot agree. At first glance, *Fulton* may appear similar to this case in that, there, a religious foster care agency, Catholic Social Services ("CSS"), claimed that a government entity, the City of Philadelphia, violated its Free Exercise and Free Speech rights by insisting that CSS not discriminate against same-sex couples as a condition of its continuing to provide foster care services. But, in fact, this case differs from *Fulton* in ways important to our review.

First, the relationship between CSS and Philadelphia was contractual and compensatory. *See Fulton v. City of Philadelphia*, 922 F.3d at 147–48 (discussing contract between Philadelphia and CSS, which provided for City to compensate CSS for certain services at per

41

diem rate for each child placed in foster care). By contrast, while New Hope is authorized by New York to provide adoption services, it does not do so pursuant to any government contract, nor does it receive any government funding. Thus, whatever authority a government entity might claim to limit the free exercise of religion by those who become its agents or accept its funding, no such authority can be claimed here.

Second, in *Fulton*, the issue under review was not the sufficiency of the pleadings, but the denial of CSS's motion for a preliminary injunction. To secure such relief, CSS had to demonstrate a reasonable likelihood of success on its Free Exercise claim, a heavier burden than New Hope bears in pleading the plausible claim necessary to avoid dismissal. *See id.* at 151–52. The Third Circuit agreed with the district court that CSS failed to carry its burden "at the preliminary injunction stage" under the *Smith* standard. *Id.* at 158–59. Whether or not this ruling survives Supreme Court review, what is important here is that in making it, the *Fulton* courts were not required to accept all CSS's allegations as true or to draw all reasonable inferences in its favor. *Compare id.* at 152 (setting forth preliminary injunction standard), *with Shomo v. City of New York*, 579 F.3d at 183 (stating motion to dismiss standard). Nowhere in *Fulton* does the Third Circuit suggest that CSS's allegations, if assumed true, were insufficient to state a Free Exercise claim.[17]

---

[17] This case also differs from *Fulton* in that OCFS does not identify New Hope as a "public accommodation," *see Fulton v. City of Philadelphia*, 320 F. Supp. 3d 661, 678–

As for *Masterpiece Cakeshop* and *Lukumi*, the Supreme Court there discussed Free Exercise violations based on fully developed evidentiary records. *See Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1726 (reviewing rulings made on cross-motions for summary judgment); *Lukumi v. Hialeah*, 508 U.S. at 528 (reviewing findings of fact and conclusions of law following nine-day bench trial). Where, as here, the parties have not yet commenced discovery, New Hope can hardly be required to plead facts as specific and detailed as those referenced in *Masterpiece Cakeshop* and *Lukumi* to avoid dismissal.

### c.     The Pleadings Raise a Plausible Suspicion of Hostility to Certain Religious Beliefs

In any event, New Hope's pleadings easily give rise to the "slight suspicion" of religious animosity that the Supreme Court, in both *Lukumi* and *Masterpiece Cakeshop*, indicated could raise constitutional concern. *Lukumi v. Hialeah*, 508 U.S. at 547; *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1731. In explaining this conclusion, we are obliged to discuss certain pleadings individually, but it is the totality that precludes dismissal.

*First*, suspicion is raised by an apparent disconnect between 18 NYCRR § 421.3(d) and the law it purports to implement, N.Y. Dom. Rel. Law § 110. As New Hope correctly observes, the statutory text is permissive, expanding the persons who "may adopt" to include

---

79 (E.D. Pa. 2018) (identifying CSS foster care services as such), *aff'd on other grounds*, 922 F.3d 140, a point we discuss further *infra* at 46.

43

unmarried and same-sex couples. It contains no mandate requiring adoption agencies to approve adoption by any persons. Moreover, the wording choice appears to have been deliberate, and even intended to allow for accommodation of religious beliefs. This can be inferred from § 110's enactment history. In a letter to the Governor that is included in the bill jacket, the New York State Catholic Conference voiced concern that the new legislation might be construed to require faith-based adoption agencies "to facilitate adoption for same-sex [couples] in violation of our religious beliefs and faith." Ltr. from N.Y.S. Catholic Conf. to Governor (July 29, 2010), New York Bill Jacket, 2010 S.B. 1523, ch. 509. The letter urged an amendment to ensure that authorization certifications were not denied or revoked on that ground. *See id.* The enacted law contained no such amendment, but the Governor, in his signing statement, sought to assuage concern. He explained that the statutory text was permissive, *i.e.*, it allowed adoptions by more persons than before, but "*without compelling any agency to alter its present policies.*" Gov. Mem., New York Bill Jacket, 2010 S.B. 1523, ch. 509 (emphasis added). Indeed, the Governor stated that the law was "a wise, just and compassionate measure that expands the rights of New Yorkers, *without in any way treading on the views of any citizen or organization.*" *Id.* (emphasis added). In short, the statutory text and history, viewed in the light most favorable to New Hope, can reasonably be construed to have alerted OCFS that what the legislature and executive intended in amending § 110 was to expand the class of potential adoptive parents to include unmarried and same-sex couples, but with

44

reasonable accommodation for religious adoption agencies whose faiths compelled narrower views.[18]

Section 421.3(d) is not consistent with this intent. Its language is not permissive, but mandatory. It unqualifiedly prohibits any "discrimination and harassment" against adoption applicants based on "race, creed, color, national origin, age, sex, *sexual orientation*, gender identity or expression, *marital status*, religion, or disability." 18 NYCRR § 421.3(d) (emphases added). Of course, OCFS has wide discretion in promulgating regulations setting forth the "standards and procedures to be followed by authorized agencies in evaluating" adoption applicants. N.Y. Soc. Serv. Law § 372-e(2). And a generally applicable anti-discrimination regulation will usually be understood to indicate neutrality rather than religious animosity. But where, as here, a regulation purports to implement a statute whose text and history signal an intent for some accommodation of religious beliefs, further inquiry is warranted to determine if agency actions affording no such accommodation are grounded in any animosity to the particular religious beliefs at issue.

*Second*, a suspicion of religious animosity is further raised here by the fact that for five years after 18 NYCRR § 421.3(d) was promulgated—from 2013 until 2018—OCFS voiced no objection to the practice New Hope appears to have adopted to avoid being seen as

---

[18] Gubernatorial signing statements are routinely relied on in construing the reach of New York statutes. *See, e.g.*, *People v. Cagle*, 7 N.Y.3d 647, 651 (2006); *Greer v. Wing*, 95 N.Y.2d 676, 680–81 (2001).

"discriminat[ing]" against unmarried or same-sex couples wishing to adopt, *i.e.*, New Hope recused itself from considering such couples' adoption applications and referred them to other agencies whose consideration would not be limited by New Hope's particular religious beliefs about family and marriage.

To be sure, New Hope's recusal policy meant that unmarried and same-sex couples could not obtain adoption services *from* New Hope. We need not here consider what discrimination concerns this might raise if New Hope qualified as a public accommodation under New York law, *see* N.Y. Exec. Law §§ 292(9), 296, because OCFS does not attempt formally to denominate it as such. This is not surprising. New Hope's adoption services are not easily analogized to traditional public accommodations such as barbershops that provide haircuts, accounting firms that offer tax advice, or bakeshops that make wedding cakes. And children awaiting adoption hardly equate to a commodity, even if their "supply" in New York (unfortunately) greatly exceeds "demand." Moreover, it appears that an authorized agency offers adoption services not only for the benefit of a public clientele (prospective parents) but, also, so that the agency itself can render a *judgment*: whether it is in the best interests of a child to be adopted by a particular applicant or applicants. Recusal is a familiar and accepted way for decisionmakers to step aside when they recognize that personal interest, predispositions, or even religious beliefs might unduly influence (or appear to influence) their ability to render impartial judgment. Thus, when an agency such as New Hope knows that, although New York law allows adoption by unmarried

46

and same-sex couples, its religious beliefs will not permit it to conclude that adoption by such a couple is in a child's best interests, recusal and referral might be understood as a means to avoid its religious views adversely informing its assessment of a couple's particular adoption application.[19] The pleadings suggest that New Hope's recusal still leaves scores of other authorized agencies available to consider the referred adoption applications. And New Hope's recusal would not seem to diminish the number of children available for adoption.[20]

This is not to suggest that no legal concerns can arise when a decisionmaker uses recusal to avoid rendering judgments for members of a protected class. We here conclude simply that, in the circumstances described, OCFS's abrupt—and as yet unexplained—2018 change of mind on the matter of whether New Hope's recusal-and-referral practice adequately avoided violating 18 NYCRR

---

[19] *See generally Ward v. Polite,* 667 F.3d 727, 735 (6th Cir. 2012) (reinstating Free Exercise and Free Speech claims of graduate student dismissed from counseling program because, based on her religious views on homosexuality, she had sought to refer certain gay and lesbian clients to other counselors, observing, "[t]he point of the referral request was to *avoid* imposing her values on gay and lesbian clients" (emphasis in original)).

[20] In its letter brief opposing New Hope's motion to expand this court's injunction pending appeal, OCFS asserts that "each time New Hope accepts a new placement request, there are fewer adoption opportunities available elsewhere," particularly for newborns—the focus of New Hope's ministry—for whom there is "especially high demand." Appellee Ltr. Br., ECF Doc. No. 199, at 7. OCFS offers no evidence to support this conclusion but will have the opportunity to do so on remand during discovery.

§ 421.3(d), coupled with its insistence that New Hope agree to approve unmarried and same-sex couples as adoptive parents or shut down a 50-year adoption ministry, raise a sufficient suspicion of hostility toward New Hope's particular religious beliefs to warrant further inquiry. *See Lukumi v. Hialeah*, 508 U.S. at 538 (stating that where law "proscribe[s] more religious conduct than is necessary to achieve [its] stated ends[,] [i]t is not unreasonable to infer" that such a law "seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation").[21]

*Third*, even before discovery, New Hope points to some statements by OCFS personnel that are similar to statements in *Masterpiece Cakeshop* that the Supreme Court interpreted as arguably evincing religious hostility. Notably, New Hope asserts that when it invoked religious freedom to protest OCFS's directive that it either agree to approve unmarried and same-sex adoption applicants or close its adoption services, OCFS responded that "[s]ome Christian ministries have decided to compromise and stay open." Compl. ¶ 192 (brackets in original). *See Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1729 (quoting statement by Colorado Civil

---

[21] Recusal and referral might also be understood to avoid another constitutional concern—compelled speech—that could arise from OCFS using 18 NYCRR § 421.3(d) to compel New Hope to render adoption judgments contrary to its religious beliefs as a condition for its continued authorization to pursue an adoption ministry. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (reiterating "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say" (internal quotation marks omitted)). We pursue this point further *infra* at 53–55, 65–70, in discussing New Hope's Free Speech claim.

Rights Commissioners that businessman who "wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, *he needs to look at being able to compromise*" (emphasis added) (internal quotation marks omitted)). Further, when OCFS was asked by a reporter to comment on the closure of a long-established Christian adoption agency in Buffalo, its spokeswoman stated that "[t]here is no place for providers that choose not to follow the law." Compl. ¶ 204; *see Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1729 (quoting Commissioners that plaintiff "can believe 'what he wants to believe' but cannot act on his religious beliefs 'if he decides to do business in the state'"). As in *Masterpiece Cakeshop*, these statements are subject to various interpretations, some benign.[22] But on a motion to dismiss, we must draw the inference most favorable to New Hope, *i.e.*, that OCFS did not think New Hope's religious beliefs about family and marriage could "legitimately be carried into the public sphere." *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. at 1729. Indeed, for OCFS, it was not enough that New Hope used recusal and referral to avoid denying adoption approval to unmarried and same-sex couples based on its own religious beliefs. Rather, for New Hope to continue its

---

[22] In *Masterpiece Cakeshop*, the Supreme Court acknowledged that the statements from that case quoted here—not the most egregious at issue, *see id.* at 1729— might mean "simply that a business cannot refuse to provide services based on sexual orientation." *Id.* But it observed that the statements could also be understood to endorse the impermissible view "that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community." *Id.*

adoption ministry in New York, OCFS insisted that it "compromise"—*i.e.*, abandon—its own religious views about family and marriage and subscribe to the state's orthodoxy on such matters. *See generally West Va. Bd. of Educ. v. Barnette*, 319 U.S. at 642. Construed in this light, the allegations cannot be dismissed for failing to state a plausible Free Exercise claim.

*Fourth*, another matter bearing on religious hostility and making dismissal premature is the severity of OCFS's actions in ordering New Hope's closure. It is plainly a serious step to order an authorized adoption agency such as New Hope—operating without complaint for 50 years, taking no government funding, successfully placing approximately 1,000 children, and with adoptions pending or being supervised—to close all its adoption operations. All the more serious when, as just discussed, the agency has, for five years and without objection by OCFS, used recusal and referral to avoid rejecting applicants on the basis of its religious beliefs. A court properly starts by asking what authority OCFS had to order such a shut down, and what procedures attend such a decision. There may be clear answers for these questions, but they are not apparent on the present record.

New York Soc. Serv. Law § 371(10)(a) authorizes OCFS to "visit[], inspect[] and supervise[]" adoption agencies. Thus, OCFS was well within its authority in visiting and inspecting New Hope in 2018. But § 371(10)(a) makes no mention of closing adoption agencies or invalidating the certificates of incorporation authorizing them to provide adoption services. *C.f.* N.Y. Bus. Corp. Law § 109(a)(1), (2)

50

(empowering Attorney General to maintain action to dissolve corporation). And while N.Y. Soc. Serv. Law § 385 does authorize OCFS to issue an order prohibiting an authorized agency from "thereafter placing out or boarding out any child," that authority is limited to four circumstances: where OCFS determines that a child was placed (1) for "gain," (2) "without due inquiry as to the character and reputation of the person with whom such child is placed," (3) "in such manner that such child is subjected to cruel or improper treatment or neglect or immoral surroundings," or (4) "in such manner that the religious faith of the child is not preserved and protected" as provided by law. N.Y. Soc. Serv. Law § 385(1). None of these circumstances obtains here. To the contrary, in October 2018, OCFS commended New Hope for its "supportive and detailed adoptive family selection process." J. App'x at 84.

In response to an inquiry from this court as to the source of its authority to order New Hope's closure, OCFS cites N.Y. Soc. Serv. Law § 34(3)(e), which authorizes the agency to "enforce," *inter alia*, laws and regulations pertaining to adoption. But nothing in that section, or any other authority cited by OCFS, indicates the scope of the enforcement authority conferred by § 34(3)(e), specifically, whether OCFS's enforcement authority is akin to that of police and prosecutors, who investigate and charge violators, or whether it also extends to judicial-like authority to prescribe the punishment for violations, specifically, the punishment of closure.

We do not here decide whether OCFS's closure authority reaches further than that expressly afforded by N.Y. Soc. Serv. Law

§ 385(1). We conclude only that until the source of any broader authority is identified and considered in light of the circumstances of this case, the severity of OCFS's comply-or-close decision adds some weight to New Hope's claim of hostility toward its religious beliefs.

*Fifth*, New Hope asserts that OCFS's 2018 actions in enforcing 18 NYCRR § 421.3(d) has forced the closure of several other adoption agencies sharing its religious beliefs about family and marriage. This warrants further inquiry because "the effect of a law in its real operation" can be "strong evidence of its object." *Lukumi v. Hialeah*, 508 U.S. at 535. If we assume, as we must on dismissal, that the effect of OCFS's comply-or-close method for enforcing § 421.3(d) fell almost exclusively on adoption services holding particular religious beliefs, that is some reason to suspect that the object of the law was to target those beliefs and to exclude those who maintain them from the adoption process. This suspicion is reinforced by circumstances, already discussed, indicating OCFS's awareness (at the pleadings stage) (1) that neither the state legislature nor executive intended for adoption agencies to have to compromise religious beliefs in order to continue operating in the state, and (2) that recusal and referral were available means for agencies to avoid having their religious beliefs adversely affect the adoption applications of unmarried and same-sex couples.

In sum, the pleadings, if accepted as true and viewed in the light most favorable to New Hope, do not permit a court to conclude as a matter of law that 18 NYCRR § 421.3(d), as promulgated and enforced by OCFS, was neutral and not based on some hostility to

52

New Hope's religious beliefs. Thus, dismissal of New Hope's Free Exercise claim was premature. The matter warrants discovery.

### 3. Free Speech Claim

New Hope claims that OCFS also violated its constitutional right to Free Speech in two ways: (a) by compelling it to say something it does not believe, *i.e.*, that adoption by unmarried or same-sex couples can be in the best interests of a child; and (b) by requiring it to associate with such couples, thereby impeding New Hope's ability to promote its own beliefs and values about religion, marriage, and family.

The district court dismissed the compelled speech part of this claim on two grounds: (1) any speech at issue is "government[] speech," for which New Hope cannot claim First Amendment protection; and (2) New Hope failed plausibly to plead that its speech was being compelled in any way. These two conclusions, in turn, informed the district court's decision to dismiss New Hope's expressive association claim because it could not plausibly plead more than "slight" injury to its expressive activities. *See New Hope Family Servs., Inc. v. Poole*, 387 F. Supp. 3d at 217, 219.

For the reasons explained herein, the pleadings, viewed most favorably to New Hope, do not permit a court to reach these conclusions now as a matter of law.

### a.   Compelled Speech

"At the heart of the First Amendment" is the principle "that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 213 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Consistent with this principle, freedom of speech means that the "government may not prohibit the expression of an idea," even one that society finds "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see generally Barr v. Am. Ass'n of Political Consultants, Inc.*, No. 19-631, 2020 WL 3633780, at *12 (U.S. July 6, 2020) (plurality opinion) (describing First Amendment as "a kind of Equal Protection Clause for ideas" (internal quotation marks omitted)). For much the same reason, government also cannot tell people that there are things "they must say." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 213 (quoting *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47, 61 (2006)); *accord Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (stating that First Amendment prevents government from "[c]ompelling individuals to mouth support for views they find objectionable"). Thus, when government "direct[ly] regulat[es] . . . speech" by mandating that persons explicitly agree with government policy on a particular

54

matter, it "plainly violate[s] the First Amendment." *Agency v. Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 213.[23]

The pleadings here, viewed most favorably to New Hope, plausibly charge OCFS with an impermissible direct regulation of speech. As discussed *supra* at 21–25, all New Hope's adoption services—from counseling birthmothers, to instructing and evaluating prospective adoptive parents, to filing its ultimate reports with the court—are laden with speech. But, more to the point, these services are provided so that, at their end, New Hope itself can *speak* on the determinative question for any adoption: whether it would be in the best interests of a child to be adopted by particular applicants. New Hope asserts that, based on its religious beliefs about marriage and family, it does not believe and, therefore, cannot state, that adoption by unmarried or same-sex couples would ever be in the best interests of a child. It charges OCFS with requiring it to say just that—or to close down its voluntary, privately funded adoption ministry. *See* Compl. ¶ 271 (alleging that OCFS "requires New Hope to engage in speech and expression that it does not wish to convey—speech and expression that violate[] its core religious beliefs—by compelling it to

---

[23] At issue in *Agency for International Development* was a challenged mandate that federal funding recipients "explicitly agree with the Government's policy to oppose prostitution and sex trafficking." 570 U.S. at 213. The Supreme Court observed that if that requirement had been "enacted as a direct regulation of speech," it "would plainly violate the First Amendment." *Id.* The Court then proceeded to explain why the requirement violated the First Amendment even as a funding condition. *See id.* at 213–18.

recommend same-sex couples or unmarried couples as adoptive parents"). These pleadings are sufficient to withstand dismissal.

Moreover, neither reason cited by the district court supports a contrary conclusion at this stage of the case.

### i. Government Speech

The district court concluded that because New Hope is a state-authorized adoption agency, any speech involved in its provision of adoption services is "government[] speech" for which New Hope cannot claim First Amendment protection. *New Hope Family Servs., Inc. v. Poole*, 387 F. Supp. 3d at 217 ("New Hope's speech, to the extent any is required when performing its services as an authorized [adoption] agency, constitutes governmental speech. . . ."); *see, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (collecting cases recognizing that Government's own speech is exempt from First Amendment scrutiny). The Supreme Court, however, has held that the mere fact that government authorizes, approves, or licenses certain conduct does *not* transform the speech engaged therein into government speech. The reason is plain: "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 137 S. Ct. at 1758 (holding that federal registration of trademark does not make the mark government speech); *see also National Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (rejecting idea that government acquires "unfettered power to reduce a group's First Amendment rights by

simply imposing a licensing requirement");[24] *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) (plurality opinion) (holding advertising limits on liquor retailers violated First Amendment, explaining that state decision to license its liquor retailers did not permit it to condition license on "surrender of a constitutional right").

The district court relied primarily on two cases to support its identification of "government[] speech" here. Both are inapt because the speech-challenged conditions were there imposed on government-funded services. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (challenging federal funding condition prohibiting legal services corporations from using funds to "challenge existing welfare law"); *Fulton v. City of Philadelphia,* 320 F. Supp. 3d 661 (challenging non-discrimination provision of contract with City to provide foster care services).[25] In *Velazquez*, the Supreme Court observed that "*[w]hen the government disburses public funds to private entities* to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." 531 U.S. at 541 (brackets in original) (emphasis added) (internal quotation marks omitted); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 214 (collecting cases recognizing that, under Spending Clause, Congress can impose

---

[24] In *Becerra*, the Supreme Court ruled, *inter alia*, that requiring a licensed pregnancy center to provide women with notice of certain state services, including abortion, violated the First Amendment by altering the content of the clinic's speech. 138 S. Ct. at 2371–76.

[25] *See supra* at 37, 41–42 (discussing *Fulton* history).

some conditions on federal funding that it could not impose directly without violating First Amendment). The district court in *Fulton* relied on *Velazquez*'s quoted language in holding that Philadelphia permissibly included a non-discrimination condition in its contract with CSS funding a part of the organization's foster care services. *See Fulton v. City of Philadelphia*, 320 F. Supp. 3d at 696–97. The reasoning of these cases does not apply here because New Hope receives no government funding, either by way of a grant program or a contract. Indeed, New Hope alleges that it avoids government funding precisely to "ensure its autonomy to operate in accordance with its religious beliefs." Compl. ¶ 51. Thus, "subsidized speech" cases cannot support the identification of "government speech" here. *See Matal v. Tam*, 137 S. Ct. at 1760–61 (Alito, J., plurality opinion).[26]

---

[26] In *Matal v. Tam*, a Supreme Court plurality treated the questions of "government speech" and "subsidized speech" as distinct, noting that subsidized speech can "implicate a notoriously tricky question of constitutional law" because, at the same time that the law recognizes that "government is not required to subsidize activities that it does not wish to promote," it also prohibits government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." 137 S. Ct. at 1760–61 (internal quotation marks omitted). Applying these principles in *Agency for International Development* and *Velazquez*, the Supreme Court ruled that the latter was determinative and that the challenged speech conditions there violated the First Amendment *even* as applied to funding recipients. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 214–15, 217–18 (holding unconstitutional funding condition requiring recipients to affirm opposition to prostitution because it compelled grant recipient "to adopt a particular belief as a condition of funding"); *Legal Servs. Corp. v. Velazquez*, 531 U.S. at 540–41, 548–49 (holding challenged funding condition on legal services unconstitutional because it "exclude[d] certain vital theories and ideas"). In *Matal v. Tam,* the plurality

Insofar as a particular viewpoint might be identified as "government speech" without regard to government funding, the *Matal* Court urged "great caution" in extending the doctrine beyond its established precedents. *Id.* at 1758. As Justice Alito explained, the government-speech doctrine is both "essential" and "dangerous": essential to avoid "paralyzing" government, *id.* at 1757 (observing that when "government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others"), but dangerous because, as we have already noted, "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints," *id.* at 1758.[27]

In *Matal v. Tam*, 137 S. Ct. at 1759–60, the Court identified three circumstances where Supreme Court precedents identified government speech: a federally created advertising program to

explained that there was no need to weigh the identified competing principles in that case because trademarks involved no government subsidy or expenditure beyond that associated with any government service. *See* 137 S. Ct. at 1761. The same conclusion obtains with respect to New Hope's privately funded, authorized adoption services.

[27] Members of the Court had also expressed reservations about the government-speech doctrine in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), discussed *infra* at 60–62, 64*. See Pleasant Grove City v. Summum*, 555 U.S. at 481 (Stevens, J., joined by Ginsburg, J., concurring) (stating that "decisions relying on the recently minted government speech doctrine to uphold government action have been few, and, in my view, of doubtful merit"); *id.* at 484 (Breyer, J., concurring) (expressing understanding that doctrine is "a rule of thumb, not a rigid category"); *id.* at 485 (Souter, J., concurring in judgment) (urging Court to "go slow in setting" bounds of government-speech doctrine).

promote the sale of beef, *see Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005); a local government's acceptance of a Ten Commandments monument for display in a city park, *see Pleasant Grove City v. Summum*, 555 U.S. 460; and a state's allowance of specialty license plates, *see Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

In the first circumstance, the Court held that the ads were government speech because "[t]he message set out in the beef promotions [was] from beginning to end the message established by the Federal Government." *Matal v. Tam*, 137 S. Ct. at 1759 (brackets in original) (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. at 560, and noting that Congress and Secretary of Agriculture provided guidelines for content of ads, Agriculture officials attended meetings at which content of ads was discussed, and Secretary could edit or reject any proposed ad).

In the monuments case, "many factors" indicated that park monuments represented government speech, among them, (a) government's historic use of monuments to speak to the public, (b) a tradition of parks selectively accepting and displaying donated monuments, (c) the public's close identification of public parks with the government owning the parkland, and (d) the accepted monuments were meant to and had the effect of conveying a government message. *Id.* at 1759–60 (citing *Pleasant Grove City v. Summum*, 555 U.S. at 472).

Finally, in the specialty plates case—described by *Matal* as "likely mark[ing] the outer bounds of the government-speech doctrine"—three factors were determinative: (a) States had long used license plates to convey government messages; (b) the public closely identified license plates with the State because it manufactured and owned the plates, generally designed them, and used them as a form of government identification; and (c) Texas maintained direct control over the messages conveyed on specialty plates. *Id.* at 1760 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. at 207–13).[28]

The factors highlighted in these cases are either not present here, or not sufficiently present at the pleading stage to warrant reliance on government speech as a ground for dismissal.

*First*, by contrast to the monuments discussed in *Pleasant Grove* and the license plates at issue in *Walker*, adoption has not historically been treated by government as a means for it to communicate with the public on various matters. Rather, adoption's singular focus is on identifying a placement that is in the best interests of a child.

*Second*, by contrast to any of the three precedents cited in *Matal*, nothing in the pleadings suggests that the public understands New Hope's expressive activities, either in generally providing adoption

---

[28] This court has relied on these three *Walker* factors in considering government-speech claims. *See, e.g.*, *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34–36 (2d Cir. 2018) (considering factors in determining that names of food vendors at state-organized lunch program were not government speech).

services or, ultimately, in recommending a child's placement, to be the State's own message. The general principle that State authorization by itself does not transform the authorized actor's speech into government speech, *see Matal v. Tam*, 137 S. Ct. at 1758, applies with particular force here, where New York itself operates 58 state-denominated adoption agencies at the same time that it authorizes some 70 private, non-profit organizations also to offer adoption services. Many of those organizations, including New Hope, have done so for decades and have long established private identities.

The pleadings further indicate that, from its first meeting with prospective adoptive parents, New Hope makes its private identity clear, specifically, its identity as a religious ministry. It starts meetings with a prayer and uses scripture passages and religious texts to explore "how faith in God can help [adoption] applicants." Compl. ¶¶ 105, 109, 111–112. A person listening to such explicitly religious messages from a private entity operating from a non-state location would not be likely to understand the messages conveyed as those of the State of New York, rather than New Hope's own. *Cf. Pleasant Grove City v. Summum*, 555 U.S. at 472 (holding government's acceptance of monument for public parkland, where government had used monuments to convey its messages to public, identified monument as "government speech"); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. at 560 (stating that message set out in challenged promotion was "from beginning to end the message established by the Federal Government"). Indeed, OCFS itself does not seem to think there is

much risk of misattribution because it nowhere suggests that there is anything improper in New Hope conveying religious messages or employing religious rituals in providing adoption services, which presumably New Hope could not do if it were speaking for the State.

Viewed most favorably to New Hope, then, the pleadings suggest that OCFS is not seeking to avoid having New Hope's views attributed to the State but, rather, is demanding that New Hope—in order to continue operating as an authorized adoption agency—express a State view with which it disagrees, *i.e.*, that it can be in the best interests of a child to be adopted by an unmarried or same-sex couple. In *Walker*, the Supreme Court stated that "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. at 219. Indeed, this limitation may apply even when the government is looking to communicate its own message through a private entity. *See id.* at 208 (stating that "Free Speech Clause itself may constrain the government's speech if . . . the government seeks to compel private persons to convey the government's speech").

*Third*, although the adoption process in New York is certainly more regulated than the trademark process at issue in *Matal v. Tam*, 137 S. Ct. at 1758–59, a court cannot conclude at the pleadings stage that "from beginning to end" the messages conveyed by New Hope are so controlled by New York as to be the State's own, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. at 560. As discussed *supra* at 11–16, the laws and regulations identifying factors relevant to determining the

best interests of a child awaiting adoption appear to afford authorized agencies considerable discretion in weighing those factors and in exercising independent judgment as to the propriety of any particular placement. By contrast to the extensive involvement of federal officials in the promotional campaign at issue in *Johanns*, it seems no New York officials engage directly with private authorized agencies as they recruit, instruct, evaluate, and ultimately recommend adoptive parents to a child's birth parents and to the court. Nothing in the pleadings indicates that OCFS officials ever review, edit, or reject a private authorized agency's best-interests assessment before a child's placement in an adoptive family. *Cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. at 213 (highlighting State's maintenance of direct control over messages conveyed on specialty plates); *Pleasant Grove City v. Summum,* 555 U.S. at 471–72 (referencing tradition of parks selectively accepting and displaying donated monuments); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. at 561 (stating that government could edit, or even reject, proposed advertisement).

In sum, on the pleadings record, none of the three factors that courts rely on in identifying "government speech" weighs in favor of identifying any speech by New Hope as such. Nor do they compel that conclusion as a matter of law when considered together. Further proceedings may produce additional evidence that casts these pleadings in a different light. We here hold only that New Hope's First Amendment compelled speech claim cannot be dismissed now on the ground that any speech at issue is government speech.

64

### ii.    No Compelled Speech

Alternatively, the district court dismissed New Hope's free speech claim because OCFS and 18 NYCRR § 421.3(d) "simply do not compel speech" or even compel New Hope "to change the message it wishes to convey." *New Hope Family Servs. v. Poole*, 387 F. Supp. 3d at 217–18.    The court acknowledged New Hope's assertion that it provides "extensive" information to potential adoptive parents and birthparents consistent with its religious views on marriage and the family.    *Id.* at 218.    Nevertheless, it concluded that "nothing is preventing New Hope from continuing to share its religious beliefs throughout the entire process."    *Id.*  Indeed, the court expressed "no doubt that New Hope's general disapproval of cohabitating unmarried couples and same sex couples will continue to be made clear."    *Id.*  Similarly, while acknowledging New Hope's complaint that forcing it to approve and recommend unmarried and same-sex couples as adoptive parents would "send a message . . . that [New Hope] accepts such relationships as appropriate and believes that adoption by such couples can be in the best interests of the child," *id.* at 217 (brackets in original) (internal quotation marks omitted), the district court concluded that, in fact, "the only message that would be conveyed" by New Hope's approving an unmarried or same-sex couple for adoption "is that, applying the [relevant] regulatory criteria . . . , placement with such a couple would be in the child's best interest," *id.*; *see also id.* at 218 ("[T]he only statement being made by approving such couples as adoptive parents is that they satisfy the

65

criteria set forth by the state, without regard to any views as to the marital status or sexual orientation of the couple.").

Both conclusions are premature. It is hardly evident from the pleadings that OCFS, in requiring New Hope to conform its policies to 18 NYCRR § 421.3(d), would permit New Hope to counsel unmarried and same-sex couples that it is in the best interests of a child to be adopted by a heterosexual married couple and *not* in the best interests of a child to be adopted by an unmarried or same-sex couple. The regulation, after all, prohibits harassment as well as discrimination and, as the district court itself recognized in a colloquy exchange, if New Hope were to express such views, it would likely face a lawsuit "the next day." J. App'x at 237.

In its brief to this court, OCFS no longer disclaims the possibility of it restricting New Hope's speech in providing adoption services. Rather, OCFS acknowledges that "any restriction on New Hope's expressive activities within the contours of its provision of adoption activities remains unclear." Appellee Br. at 54.[29] While OCFS maintains that "New Hope remains free to espouse its beliefs about marriage and family," and to "advocat[e] for adoptions by married heterosexual couples, *outside* the contours of its provision of . . . adoption services," *id.* (emphasis added), that concession is meaningless. New Hope does not claim that OCFS would compel or

---

[29] This represents a departure from OCFS's position before the district court. It there asserted that 18 NYCRR § 421.3(d) "neither compels, nor prohibits, New Hope from . . . expressing its beliefs, religious or otherwise." J. App'x at 188.

limit its speech if it loses authorization to provide adoption services. Rather, New Hope sues OCFS for violating its right to free speech as an authorized adoption agency. The pleadings record admits a plausible inference that New Hope cannot both comply with 18 NYCRR § 421.3(d), as required to retain its authorization to provide adoption services, *and* express its view that adoption by unmarried and same-sex couples is not in the best interests of a child. Thus, discovery is warranted to determine the extent to which the required compliance will restrict or compel New Hope's speech.

Nor is a different conclusion warranted by OCFS's assertion that "all" it has done to date is "regulate New Hope's conduct—its refusal to provide adoption services to or place children with unmarried and same-sex couples." *Id.* at 51. As the Supreme Court has long recognized, even conduct can claim the protections of Free Speech where "[a]n intent to convey a particularized message [is] present, and . . . the likelihood [is] great that the message would be understood by those who viewed" or learned of the conduct. *Texas v. Johnson*, 491 U.S. at 404 (first brackets in original) (internal quotation marks omitted); *see Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (same). In any event, the pleadings here, viewed most favorably to New Hope, demonstrate more than conduct. New Hope asserts that, consistent with New York law, it can only place a child with an adoptive couple if it approves the placement as in the best interests of the child. *See* 18 NYCRR § 421.18(d). Thus, New Hope has a plausible claim that by compelling it to place children with unmarried and same-sex couples, OCFS is

67

necessarily compelling New Hope to engage in the speech required for that conduct—speech with which New Hope does not agree.

The district court recognized the inextricable link between New Hope's speech and conduct in the placement of a child for adoption. Nevertheless, the court dismissed New Hope's free speech claim upon concluding that the only message that its approval would convey is that an unmarried or same-sex couple satisfies the State regulations' criteria for an adoptive placement. *See New Hope Family Services v. Poole*, 387 F. Supp. 3d at 217. This implies that approval communicates no judgment by New Hope itself. Again, this conclusion cannot be reached at the pleadings stage.

As we have already observed, the regulatory criteria applicable to adoption provide agencies with no mere quantitative checklist.[30] Rather, the regulations, by their nature, entrust authorized agencies with considerable discretion to exercise judgment in determining the best interests of a child. *See supra* at 11–16 (discussing various regulations). OCFS acknowledges as much in stating that "[t]he statutory [and regulatory] scheme bestows significant authority on authorized agencies." Appellee Br. at 4. Nowhere do the regulations define "best interests." They state only that the determination should consider, (1) "the appropriateness of placement in terms of the age of the child and of the adoptive parent(s)"; (2) "the physical and emotional needs of the child in relation to the characteristics,

---

[30] We have no occasion here to consider whether other regulations, including quantitative factors, might implicate compelled speech in certain circumstances.

capacities, strengths and weaknesses of the adoptive parent(s)"; and (3) "the requirement . . . to place minor siblings or half-siblings together . . . unless . . . such placement [is determined] to be detrimental to the best interests of one or more of the children." *Id.* § 421.18(d). These factors admit no single answer, but require the exercise of agency judgment. Moreover, the regulation states that a best-interests determination is "not limited to" these factors, *id.*, which further cautions against a narrow characterization of the message conveyed by such a determination.

Related regulations are similarly broadly cast. For example, in the home study that adoption agencies must conduct before deciding whether it is in the particular interest of a child to be placed with an applicant, the agency must "explore each applicant's ability to be an adoptive parent," discussing a range of topics including "principles related to the development of children," "reasons a person seeks to become an adoptive parent," the applicant's "understanding of the adoptive parent role," the applicant's "psychological readiness to assume responsibility for a child," and the agency's role in "supervising and supporting the adoptive placement." *Id.* § 421.15(d). Agencies must also "explore" an applicant's "capacity to give and receive affection," and "ability to provide for a child's physical and emotional needs." *Id.* § 421.16(a). The regulations do not instruct authorized agencies as to how they should evaluate or weigh these factors. Rather, these matters are left to the exercise of agency judgment and discretion, which will necessarily be informed,

to at least some degree, by the agency's conception of a child's best interests.

In New Hope's case, that conception has, as its starting point, the "biblical model for the family" as "one man married to one woman for life." Compl. ¶ 56. Given the discretion inherent in New York laws and regulations pertaining to the identification of adoption placements that are in the best interests of a particular child, a court could not conclude on the pleadings that New Hope can identify a child's best interests, and, therefore, approve an adoption placement, without communicating its viewpoint—or the one that it complains OCFS is compelling it to adopt. Thus, it was premature for the district court to conclude that requiring New Hope to provide adoption services to unmarried and same-sex couples compelled no speech subject to First Amendment protection.

### b. Expressive Association

As a second part of its Free Speech claim, New Hope charges OCFS with impeding its right of association.

"Association" occupies a clearer place in American history than in American law. As to the former, what Tocqueville famously observed in 1835 has remained true for almost two centuries: "In no country in the world has the principle of association been more successfully used or applied to a greater multitude of objects than in America." 1 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 191 (Phillips Bradley ed., Vintage Books 1990) (1835). As pertinent here, one of the "objects" for which Americans have laudably associated

70

throughout their history has been to care for orphaned and abandoned children. *See supra* at 8 n.3.

The law, however, recognizes no fundamental "right of association." The First Amendment does not, by its terms, pronounce such a right. *See City of Dallas v. Stanglin*, 490 U.S. 19, 23–24 (1989). Nevertheless, the Supreme Court has applied the First Amendment to association claims in two limited circumstances: "choices to enter into and maintain certain intimate human relationships," and "associat[ion] for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617, 618 (1984); *see Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts, Appellate Div. of the Supreme Court of N.Y.*, 852 F.3d 178, 187–88 (2d Cir. 2017). It is the latter—so-called "expressive association"—that New Hope invokes in this case.

New Hope asserts that its adoption ministry is an expressive association in that it employs protected speech to "convey[] a system of values about life, marriage, family and sexuality to both birthparents and adoptive parents through its comprehensive evaluation, training, and placement programs." Compl. ¶ 270. New Hope alleges that OCFS's actions in applying 18 NYCRR § 421.3(d) impair New Hope's ability to advocate for its values. Specifically, New Hope maintains that requiring it to "[i]nclud[e] unmarried or same-sex couples in [its] comprehensive evaluation, training, and placement programs and adoptive-parent profiles would change

71

New Hope's message and counseling to adoptive families and birthparents." *Id.* ¶ 273.[31]

In dismissing New Hope's association claim, the district court concluded that the adoption agency could show only "slight impairment" to its expressive activity because New Hope was "not being required to hire employees that do not share [its] same religious values," and was not "prohibited in any way from continuing to voice [its] religious ideals." *New Hope Family Servs., Inc. v. Poole*, 387 F. Supp. 3d at 219. For the same reasons the latter conclusion cannot be reached at the pleading stage with respect to New Hope's compelled speech claim, *see supra* at 65–70, it cannot be reached with respect to New Hope's expressive association claim.

As for the "slight impairment" conclusion, it too is premature. Compelled hiring, like compelled membership, may be a way in which a government mandate can "affect[] in a significant way [a]

---

[31] OCFS argues on appeal that New Hope is not engaged in expressive association because it is "not open to membership and was not organized for the purpose of engaging in expressive activities." Appellee Br. at 58. The membership argument fails for reasons stated in text *infra* at 72–74 with respect to compelled hiring. As for "purpose," even if OCFS's urged conclusion could be reached at the pleadings stage, it would not compel dismissal. The Supreme Court has required that an organization "engage in some form of expression"—not that it be expressly constituted for that purpose—to claim expressive association protection. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000), *as amended* (Nov. 29, 2000) (stating that Supreme Court has not required organization to be "primarily expressive[] in order to receive constitutional protection for expressive associational activity"). The pleadings easily satisfy this standard.

group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. at 648. But it is not the only way. *Cf. Rumsfeld v. FAIR,* 547 U.S. at 69 (acknowledging that "freedom of expressive association protects more than just a group's membership decisions").

The pleadings, viewed most favorably to New Hope, indicate that OCFS, in enforcing 18 NYCRR § 421.3(d), may require New Hope to "correct[] or disciplin[e]" employees who, sharing New Hope's religious beliefs, act on, or even express, those beliefs in interacting with birthparents or prospective adoptive parents. 18 NYCRR § 421.3(d) (prohibiting discrimination and harassment and requiring authorized agencies to correct or discipline employees who engage in such). In short, New Hope complains that OCFS is not only directly limiting its own ability to promote its beliefs and values through its adoption services, but also, OCFS is requiring New Hope to use discipline to enforce those same expressive limitations as to its employees. This admits a plausible inference that OCFS is making association with New Hope "less attractive" for those who would otherwise combine their voices with the agency's in order to convey their shared beliefs and values more effectively. *See Rumsfeld v. FAIR,* 547 U.S. at 68–69.

In *Rumsfeld*, the Supreme Court rejected an expressive association challenge to a federal law requiring schools to afford equal campus access to military recruiters. The Court observed that such compelled access did not affect "a law school's associational rights" because "[s]tudents and faculty" remained "free to associate to voice their disapproval of the military's message" and "nothing

about the statute affect[ed] the composition of the group by making group membership less desirable." *Id.* at 69–70. By contrast, here, the pleadings admit a plausible inference that neither New Hope nor any employees that associate with it in its adoption ministry will be free to voice their religious beliefs about the sorts of marriages and families that they believe best serve the interests of adopted children. Thus, discovery is required to determine what, if any, leeway OCFS will grant New Hope and its like-minded employees in expressing their religious views before any determination can be made as to how significantly OCFS's challenged actions will impede New Hope's associational ability to advocate its religious viewpoints.

Because New Hope's expressive association claim survives dismissal on these grounds, we need not now conclusively decide whether a claim of compelled association with unmarried and same-sex couples pursuing adoption implicates expressive association. While such couples may not be seeking the sort of affiliation with New Hope generally associated with membership organizations, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, neither is theirs the "chance encounter[]" of dance-hall patrons, *City of Dallas v. Stanglin*, 490 U.S. at 25. Rather, the pleadings, viewed most favorably to New Hope, indicate that OCFS is requiring New Hope to associate with unmarried and same-sex couples for the purpose of providing services leading to adoption, an outcome that could tie New Hope, the couple, and an adopted child together for months, or even years. *See supra* at 21–25. To the extent New Hope maintains that such compelled association would impede its ability to convey its religious

74

beliefs about adoption in a way distinct from that resulting from the compelled speech of which it complains, it will have the opportunity to develop supporting evidence during discovery. We do not here predict whether New Hope will be able to do so. *Cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019) (holding expressive association challenge to law prohibiting videographers from discriminating between heterosexual and same-sex weddings was "really a disguised free-speech claim" duplicative of claim on compelled-speech theory, and allowing only latter to proceed). We conclude only that the expressive association claim does not fail as a matter of law on the pleadings.

In sum, we conclude that none of New Hope's First Amendment claims—for Free Exercise of Religion, for Free Speech on a theory of compelled speech, and for Free Speech on a theory of expressive association—can be dismissed at the pleadings stage. Accordingly, we reverse the judgment of dismissal as to these claims.

## III.  Preliminary Injunction

We review the denial of a motion for a preliminary injunction for abuse of discretion, which we will identify only if the decision rests on an error of law or a clearly erroneous finding of fact, or cannot be located within the range of permissible decisions. *See, e.g., North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). The district court's denial of New Hope's preliminary injunction motion as moot rests on an error of law, specifically, the court's dismissal of all New Hope's claims. For reasons stated in the

preceding sections of this opinion, New Hope's Free Exercise and Free Speech claims should not have been dismissed and, thus, its preliminary injunction motion was not moot.

New Hope urges that in vacating the denial of its preliminary injunction motion, this court direct entry of the requested injunction on remand. We recognize our authority to do so. *See, e.g.*, *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 489 (2d Cir. 2013); *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 873 (2d Cir. 1996) ("Although reversal of an order denying an application for a preliminary injunction is customarily accompanied by a directive that the district court conduct a new hearing on remand, an appellate court, on a finding of merit in plaintiff's case, can in the alternative direct the district court to issue the injunction." (quoting *Patton v. Dole*, 806 F.2d 24, 31 (2d Cir. 1986))). But we leave it to the district court in the first instance to decide if such equitable relief is warranted and its exact scope. Nevertheless, a few observations may be useful to guide the district court's exercise of its discretion on remand.

*First*, because New Hope seeks a preliminary injunction to stay government action taken in the public interest pursuant to a statutory (and regulatory) scheme, it must establish both a likelihood of success on the merits and irreparable harm in the absence of an injunction. *See Alliance for Open Soc'y Int'l, Inc. v. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011), *aff'd.*, 570 U.S. 205; *Alleyne v. N. Y. State Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008). The "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (1996)

(internal quotation marks omitted).  Thus, "the dominant, if not the dispositive, factor" in deciding whether to grant a preliminary injunction in this case is New Hope's ability to demonstrate likely success on the merits of its Free Exercise and Free Speech claims.  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d at 488.

*Second*, when the pleadings are viewed in the light most favorable to New Hope, serious concerns arise as to whether OCFS's challenged actions violate the Free Exercise and Free Speech Clauses.  *See supra* at 32–53 (discussing Free Exercise claim); *id.* at 65–70 (discussing compelled speech claim).  In considering a motion for an injunction, however, a court is not required to view the pleadings in the light most favorable to New Hope.  *See Pope v. Cty. of Albany*, 687 F.3d 565, 570 (2d Cir. 2012).  Nevertheless, because New Hope's complaint is verified, the district court can treat its detailed factual allegations as evidence.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1339 (4th ed. 1990).

In doing so here, the district court should consider that the facts alleged in the verified complaint, as well as those in sworn affidavits submitted by New Hope in support of a preliminary injunction, are largely unrefuted in OCFS's filings in opposition to injunctive relief. The single opposing affidavit submitted by OCFS asserts that 18 NYCRR § 421.3(d) applies uniformly and neutrally to all authorized adoption agencies in New York.  J. App'x at 169.  But the assertion is conclusory and, while true as applied to the statutory text, *see supra* at 37, does not address pleaded circumstances raising neutrality

concerns, detailed *supra* at 43–53. The district court may properly consider the lack of evidence assuaging these concerns in determining the likelihood of New Hope succeeding on its Free Exercise claim.

Similarly, in determining the likelihood of New Hope succeeding on its Free Speech claim, the district court can consider OCFS's failure to provide factual support for its contention that a privately funded, faith-based adoption agency such as New Hope engages in "government speech" when it makes adoption recommendations based on its determination of the best interests of a child. Nothing in the existing record indicates that any listener has ever understood New Hope to be speaking or acting as an agent of the State in providing adoption services. Indeed, an affidavit submitted by New Hope indicates the contrary. *See generally* J. App'x 131–134 (Bleuer Aff.). Nor is there existing record evidence that state officials exercise the degree of control over New Hope's expressive activities generally reflective of government speech. *See supra* at 63–64.

As to the likelihood of New Hope showing that OCFS is compelling it to speak contrary to its beliefs, the district court should consider whether an agency's adoption recommendation—expressly or implicitly—pronounces a particular placement to be in the "best interests" of the child. It should also consider the possibility of New Hope's expressive activities in the provision of adoption services being restricted or penalized, particularly in light of OCFS's inability to assure otherwise in this court. *See supra* at 66.

*Third*, in opposing a preliminary injunction, OCFS characterizes "adoptive services" as "government services." J. App'x at 168–69. To the extent this characterization bears on the likelihood of New Hope succeeding on its claims, the district court can consider whether laws permitting only State "authorized" agencies to provide adoption services and establishing criteria for the provision of such services warrant recognizing the services themselves as governmental. Factors relevant to this determination can include that (a) authorized agencies, as in New Hope's case, can be privately funded and faith based; (b) the State does not preclude faith-based organizations from referencing religious beliefs and using religious rituals in providing adoption services, something that the State itself could not do; (c) the State itself operates over 50 adoption agencies at the same time it authorizes some 70 private adoption agencies; (d) the State's criteria for adoption services appear to afford authorized agencies considerable discretion in the final identification of the best interests of an adopted child; and (e) State regulations prohibit (or at least limit) consideration of certain facts, including a prospective parent's sexual orientation and marital status, in identifying the best interests of an adopted child.

*Fourth*, OCFS's declaration stresses the State's strong interest in preventing discrimination against prospective unmarried and same-sex couples. It maintains that preventing such discrimination serves the bests interests of children awaiting adoption by "provid[ing] a broad and diverse pool of adoptive parents" and, thereby, "maximiz[ing] the number of prospective adoptive parents." *Id.* at

It also serves "to prevent the trauma and social harm caused by discrimination against lesbian, gay, bisexual, transgender, queer or questioning (LGBTQ) people." *Id.*

Should the district court determine that New Hope is likely to succeed in demonstrating that 18 NYCRR § 421.3(d) is not being applied neutrally but, rather, is being used to exclude its religious beliefs from the public arena or to compel (or preclude) its speech, OCFS must do more than identify a State interest. It must demonstrate that its challenged actions are narrowly tailored to serve that interest without unnecessarily impairing New Hope's Free Exercise of Religion or Free Speech. *See, e.g., Lukumi v. Hialeah,* 508 U.S. at 546. Should the district court consider tailoring, record evidence raises certain concerns.

To state the obvious, it is no small matter for the State to order the closure of a privately funded, religious adoption ministry that has, over 50 years of authorized operation, successfully placed approximately 1,000 children in adoptive homes, particularly when there is no suggestion that any placement was not in the best interests of the adopted child. While there is no question that OCFS is authorized to enforce 18 NYCRR § 421.3(d), the exact source of its authority to order closure for a violation of that regulation is not clear on the present record. *See supra* at 50–51. Thus, identifying that authority may be important to any tailoring determination.

Even assuming such authority, however, other tailoring concerns warrant consideration. For example, New Hope asserts that

80

it does not provide adoption services to unmarried and same-sex couples because its religious beliefs do not permit it to state that it would be in the best interests of a child to be placed for adoption with such couples. To avoid its beliefs preventing such couples' pursuit of adoption, New Hope is willing now, as it has in the past, to recuse itself from their cases, and to refer them to other adoption agencies, including those operated by the State. The question arises: Is this recusal-and-referral practice a narrowly tailored means for avoiding discrimination without impairing New Hope's Free Exercise and Free Speech rights?

To be sure, recusal and referral do not permit unmarried and same-sex couples to obtain adoption services from New Hope. But the existing record reveals no complaint from any referred couple. Nor does it indicate that any couple was unable to adopt as a result of referral. In the absence of any such evidence, it is not evident that, pending resolution of the merits of this case, recusal and referral poses such a risk of trauma and social harm to unmarried and same-sex adoption applicants that nothing less than the closure of New Hope's adoption operation can adequately safeguard the State's interests.[32] Should OCFS adduce such evidence on remand, the district court can properly consider it in light of the totality of the

---

[32] Insofar as OCFS also asserts a State interest in avoiding trauma and social harm to LGBTQ children awaiting adoption, that appears not to be at issue in this case given that New Hope professes to focus its adoption efforts on infants under the age of two. But, of course, if OCFS thinks otherwise, it can clarify its position on remand.

circumstances, including how, if at all, New Hope's recusal-and-referral practice limits the ability of unmarried and same-sex couples easily to obtain adoption services;[33] and how well the State's interest in maximizing both the number and diversity of prospective adoptive parents is served by (a) allowing New Hope to continue providing adoption services subject to a recusal-and-referral practice, as compared to (b) requiring New Hope to close its adoption operation. These questions, like adoption itself, must also take into account the best interests of the many children awaiting adoption in a State where they number far more than the persons willing to adopt them.

In sum, because we reverse the dismissal of New Hope's Free Exercise and Free Speech claims, we also vacate the denial of New Hope's preliminary injunction motion as moot. This court does not order the district court on remand to grant such an injunction. Rather, we leave it to the district court, in the first instance, to weigh the merits of the motion consistent with this opinion.

## IV. Conclusion

To summarize,

(1) The pleadings, viewed in the light most favorable to plaintiff New Hope, state plausible claims under the Free Exercise

---

[33] *See supra* at 47 n.20.

and Free Speech Clauses of the Constitution. Among other things, the pleadings,

   (a) raise a plausible suspicion that OCFS acted with hostility towards New Hope because of the latter's religious beliefs,

   (b) plausibly allege that New Hope would be compelled to speak or associate in violation of those beliefs if the regulation in question were enforced, and

   (c) do not permit a court to conclude as a matter of law that New Hope's speech equates to government speech merely because New York State has authorized New Hope to provide adoption services.

(2) This case is not analogous to *Fulton v. City of Philadelphia*, 922 F.3d 140 (3d Cir. 2019), *cert. granted*, 140 S. Ct. 1104 (2020), now pending before the Supreme Court, because,

   (a) New Hope is not under contract with and receives no funding from OCFS,

   (b) OCFS has not identified New Hope as a public accommodation, and

   (c) the issue on this appeal is whether New Hope has pleaded sufficiently plausible claims to defeat dismissal, not whether it has demonstrated the

likelihood of success on the merits required for the injunctive relief denied in *Fulton*.

(3) Because New Hope's Free Exercise and Free Speech claims should not have been dismissed, its motion for a preliminary injunction was not moot and should not have been denied on that ground.

Accordingly, we REVERSE the district court's judgment insofar as it dismissed New Hope's Free Exercise and Free Speech claims, and we VACATE that judgment insofar as it denied New Hope's motion for a preliminary injunction. We REMAND the case to the district court for further proceedings consistent with this opinion, including prompt consideration of the merits of the reinstated preliminary injunction motion. To facilitate prompt review, we ORDER any party wishing to supplement its initial preliminary injunction filings in the district court to do so within ten days of the issuance of this court's mandate. Any appeal from a ruling by the district court on the preliminary injunction motion shall return to this panel. The limited injunction entered by this court pending appeal shall remain in effect unless and until vacated or modified by the district court. New Hope's June 18, 2020 motion for this court to expand this injunction pending appeal is DENIED as moot.